LONE STAR STEEL COMPANY, a
Texas Corporation, Petitioner,

v.

Joseph F. DOLAN, Executive Director,
Department of Revenue, State of
Colorado, Respondents.

No. 81SC382.

Supreme Court of Colorado,
En Banc.

Aug. 22, 1983.

Welborn, Dufford & Brown, Beverly J. Quail, Kathryn L. Powers, Mary Ann Steefel, Denver, for petitioner.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Chris J. Eliopulos, Asst. Atty. Gen., Denver, for respondents.

ROVIRA, Justice.

We granted certiorari to review a decision of the court of appeals holding certain income of petitioner Lone Star Steel Co. (Lone Star) taxable in Colorado. *Lone Star Steel Co. v. Dolan*, 642 P.2d 29 (Colo.App. 1981). We affirm in part and reverse in part.

## I.

Lone Star is an integrated steel company that mines its own iron ore; processes it into pig iron and then into steel; rolls the steel into skelp, which in turn is made into pipe; and markets the pipe. The corporation also has its own coal mines in Oklahoma and Arkansas. It has its commercial and legal domicile in Texas, with its executive offices in Dallas. Lone Star is a subsidiary of Philadelphia and Reading Corporation, which in turn is wholly owned by Northwest Industries, Inc., a diversified holding company incorporated in Delaware.

Approximately ninety percent of Lone Star's manufacturing operations are conducted in Lone Star, Texas, and the remainder are conducted at a plant in Fort Collins, Colorado. Manufacturing and selling pipe from skelp manufactured at Lone Star's Texas plant is the only business that petitioner conducts in Colorado. The pipe manufactured in Colorado is line pipe and standard pipe. Line pipe is used primarily underground as transmission or gathering lines for oil and gas, and standard pipe is used in commercial and residential construction. The Texas plant, in addition to manufacturing line pipe and standard pipe, also manufactures casing and tubing for vertical placement in oil and gas wells. Because casing and tubing extends to considerable depths, it must have a very high tensile strength and is therefore made from a higher quality steel than are line pipe and standard pipe.

This case arises from the assessment of tax deficiencies against Lone Star for the years 1970–73. The assessment was protested by Lone Star, but upheld by the Executive Director of the Department of Revenue. After a trial de novo, the district court affirmed the assessment, which was subsequently affirmed by the court of appeals.

## II.

Under the Multistate Tax Compact (Compact), to which Colorado is a party, a corporate taxpayer may elect to apportion its income according to the provisions of the Compact or under the regular Colorado corporate income tax apportionment provisions. Section 24–60–1301, Art. III, C.R.S. 1973 (1982 Repl.Vol. 10). For the years in question, Lone Star elected to be taxed under the Compact.

According to Article IV of the Compact, certain income is allocated to particular states and not apportioned among states. For example, interest and dividends are allocable to the state of the taxpayer's commercial domicile to the extent that they constitute "nonbusiness income." Section 24–60–1301, Art. IV, ¶ 7. "Nonbusiness income" is defined as "all income other than business income." Art. IV, ¶ 1(e). "Business income" means:

"income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."

Art. IV, ¶ 1(a).

The amount of income apportioned to a particular state, and therefore taxable by it, is determined by multiplying the business income by a fraction, the numerator of which is the sum of property, payroll, and sales factors, and the denominator of which is three. Art. IV, ¶ 9. Each of the three factors is a fraction representing the proportion of Colorado property, payroll, or sales to the total property, payroll, or sales. Thus, the formula is:

$$\frac{\frac{\text{Colo. Property}}{\text{Total Property}} + \frac{\text{Colo. Payroll}}{\text{Total Payroll}} + \frac{\text{Colo. Sales}}{\text{Total Sales}}}{3} = \text{Apportionment Fraction}$$

At issue in this case are three questions: (1) whether certain sales constitute Colorado sales; (2) whether dividends paid by a subsidiary of Lone Star are to be apportioned or are to be allocated to Texas; and (3) whether interest paid by Northwest Industries to Lone Star is to be apportioned or allocated to Texas.

### III.

Many of Lone Star's customers who purchase line pipe use it underground to carry oil and gas and they want the pipe coated and wrapped with tar and paper to prevent rust. For this work Lone Star recommends the Gaido-Lingle Company, an unaffiliated company that is located near the Fort Collins plant. Lone Star employees deliver the pipe to Gaido-Lingle using Lone Star equipment; and if it is damaged through the fault of Gaido-Lingle, Lone Star has a practice of replacing the pipe, although it is under no obligation to do so. At the time of delivery to Gaido-Lingle, Lone Star bills the customer for the price of the pipe sold. Gaido-Lingle or the customer arranges for delivery to the customer and Gaido-Lingle bills the customer for its services.

Lone Star considers sales of pipe to out-of-state customers to be non-Colorado sales if the pipe is shipped by carrier out of state directly from the Fort Collins plant, or if the pipe is taken to Gaido-Lingle for wrapping and then shipped by carrier to the out-of-state purchaser. If the out-of-state purchaser picks up the pipe in its own trucks, either from the Lone Star plant or from Gaido-Lingle, Lone Star treats the transaction as a Colorado sale.

In dispute here is whether sales to out-of-state purchasers are Colorado sales if the pipe is first taken to Gaido-Lingle for wrapping and then shipped out of state by common carrier.

Art. IV, ¶ 16(a) of the Compact defines a sale of tangible personal property as a Colorado sale if "the property is delivered or shipped to a purchaser, other than the United States Government, within this State regardless of the f.o.b. point or other conditions of the sale."

The Department of Revenue (Department) contends that once the pipe is delivered to Gaido-Lingle Lone Star's obligations are satisfied. It claims that delivery is "where the seller completes his performance and a buyer may logically use and consume the purchased product in the state of delivery without first shipping the same product to the state in which the buyer is located." The Department further argues that this case is governed by the same principle that requires sales to out-of-state customers be treated as Colorado sales when customers take delivery at Lone Star's Fort

Collins plant for transport out of state by their own trucks.[1]

Lone Star argues that its continuing involvement with the pipe after delivery to Gaido-Lingle by replacing damaged pipe and by occasionally aiding the customer in seeking compensation for pipe damaged in shipment after the wrapping demonstrated that there is no delivery in Colorado. Lone Star also argues that the rationale of the court of appeals that delivery takes place in Colorado because all of Lone Star's obligations are satisfied when it turns the pipe over to Gaido-Lingle is erroneous. It points out that the same rationale would apply to the delivery of pipe to a common carrier for shipment. Under such reasoning, Lone Star argues, it would have no out-of-state sales.

We agree with Lone Star that these sales should not be considered Colorado sales. The principal draftsman of the Uniform Division of Income for Tax Purposes Act (UDITPA) has described the purpose behind paragraph 16 as follows:

"Sections 15 through 17 of the act provide for the computation of the sales factor. Two major problems are encountered in respect to these provisions. The first problem arises because, with two exceptions, sales are attributed to the consumer state rather than to the state of sales activity or the place where goods are appropriated to the orders. If the taxpayer is not taxable in the state to which the goods are shipped or if the purchaser is the United States Government, the sales are attributed to the state from which the goods are shipped. Manufacturing states probably would prefer a system attributing sales to the place from which goods are shipped in every case. However, the national conference was of the opinion that such a system would merely duplicate the property and payroll factors which emphasize the activity of

the manufacturing state, so that there would tend to be a duplication by such a sales factor. Moreover, it is believed that the contribution of the consumer states toward the production of the income should be recognized by attributing the sales to those states. The exception in the case of the United States Government was included because consumption of such sales cannot be said to occur in a specific state, particularly in the case of shipments to overseas points of embarkation. In the manufacturing states, some opposition to the method of apportioning sales is to be expected, although once again it is believed that the over-all benefits of uniformity and the equities of the situation will mitigate this facet of the act becoming a major enactment hurdle."

Pierce, *The Uniform Division of Income for State Tax Purposes,* 35 Taxes 747, 780 (1957).[2]

The language of paragraph 16(a) necessitates our conclusion that these sales are out-of-state sales for income tax purposes. It speaks of property "delivered or shipped to a purchaser ... within this state." The pipe is delivered to Gaido-Lingle, which is not a purchaser, but is instead merely an intermediary, much as a common carrier is. The difference is that Gaido-Lingle transforms the pipe physically, while a carrier transports it spatially. There seems little reason in policy to treat the two kinds of transactions differently. In neither case has the purchaser actually taken delivery of the pipe. Moreover, there is no suggestion that the procedure is used in an attempt to evade Colorado tax.

Consequently, we hold that when the pipe is delivered to Gaido-Lingle for wrapping and then shipped by common carrier to an out-of-state purchaser there is no Colorado sale for income tax purposes.

1. The proper treatment of sales when the out-of-state customer picks the pipe up in its own trucks and carries it out of state is not at issue here, and we express no view on it.

2. Sections 15–17 of the UDITPA are identical to Article IV, paragraphs 15 through 17 of the Compact. Thus, commentary on the UDITPA is relevant to interpretation and application of the Compact.

## IV.

In 1972 Lone Star formed, and became the principal shareholder of, Lone Star Steel International Sales Corporation (International), a Delaware Corporation, as a domestic international sales corporation (DISC) under the Internal Revenue Code of 1954, as amended. Congress has conferred certain tax advantages on DISC's to strengthen the financial position of domestic exporters. International exports oil casing and tubing manufactured at Lone Star's Texas plant to domestic oil companies with foreign operations. It operates out of the general offices of Lone Star in Dallas and is managed by Lone Star personnel who are paid by Lone Star. International periodically pays dividends to Lone Star, which result from commissions paid by Lone Star on the exports.

Another source of Lone Star's income is interest on short-term loans that it makes to its parent, Northwest Industries. Lone Star has surplus funds not immediately needed for current operations that it lends to Northwest at the existing prime interest rate. It transfers funds to Northwest two or three times a week. Lone Star's assistant comptroller testified concerning the loans as follows:

"We anticipated our cash requirements usually on a quarterly basis. For instance, we know when we had to make quarterly income tax payments, not directly to IRS, but through our parent company. We had interest coming up on our long term debt. We had dividends we had to meet on certain dates, and we have a capital expenditure program going on from time to time. And we knew when we needed those moneys. So we tried to time the maturity date of the notes when we would need those funds."

In preparing its income tax returns for the years in question, Lone Star allocated away the dividends from International and interest on the loans from Northwest Industries, thereby excluding them from the computation of its total income taxable in Colorado. A deficiency was assessed and ultimately upheld by the court of appeals.

Lone Star argues that the dividends are not taxable in Colorado because none of the products exported by International are manufactured in Colorado and none of its operations are performed by Colorado employees. It contends that, under the Compact, International's dividends and the Northwest interest are nonbusiness income and are therefore to be allocated away. It also argues that taxation of the dividends and interest violates the due process clauses of the United States and Colorado Constitutions and the commerce clause of the United States Constitution.

As discussed previously, only "business income"—that is, "income arising from transactions and activity in the regular course of the taxpayer's trade or business" —is properly apportionable. Lone Star does not really dispute that it receives the dividends from International in the regular course of business, but instead argues that to include dividend income within the definition of "business income" would be contrary to decisions of the United States Supreme Court because there is an insufficient nexus between the dividends and Colorado. This argument will be addressed in the discussion of the extent of petitioner's unitary steel business in part V. below.

In determining whether the interest from the loans to Northwest Industries constitutes business income, the crucial inquiry is the "frequency and regularity of the activity," *Atlantic Richfield Co. v. Colorado,* 198 Colo. 413, 417, 601 P.2d 628, 631 (1979), bearing in mind that the income must be related to the business being conducted within the state to ensure that extra-territorial value is not being taxed.

We find the Supreme Court of Oregon's analysis in *Sperry & Hutchinson Co. v. Department of Revenue,* 270 Or. 329, 527 P.2d 729 (1974), persuasive on the issue of the taxability of the interest. Sperry & Hutchinson Co. (S & H) was incorporated in New Jersey, commercially domiciled in New York, and did business in forty-eight states including Oregon. S & H's primary business, and the only business conducted in Oregon, was a trading stamp promotional

service for retailers. S & H invested in three kinds of securities: (1) short-term (less than twelve months) securities held pending use of the funds in its trading stamp business; (2) short-term securities held pending acquisition of other companies or favorable developments in the long-term securities market; or (3) long-term securities held as an investment. S & H allocated interest on all the securities to its domicile, instead of apportioning it among the states in which it did business. The court held that the securities, both short and long-term, held pending acquisition of other companies or favorable developments in the long-term securities market or for investment were properly allocated to S & H's commercial domicile because "neither the capital invested nor the income derived therefrom are a part of the trading stamp business conducted in this state." The court held, however, that the other short-term securities were apportionable. They were purchased during periods of cash flow surplus and liquidated when needed to meet business obligations during periods of cash flow deficit. The court held that the interest arose " 'from transactions and activity in the regular course of the taxpayer's trade or business' and is part of S & H's unitary business." Id. at 333, 527 P.2d at 731.

■ The same reasoning applies to Lone Star. The interest derived from the short-term notes is an integral part of Lone Star's business. The surplus funds are produced by that business, the investments are short-term, liquid, made with the intent that both the principal and interest are to be used "in the regular course of the taxpayer's trade or business," and "constitute integral parts of the taxpayer's trade or business operations."

Consequently, we conclude that the interest income is business income apportionable to Colorado.

### V.

### A.

■ The resolution of Lone Star's constitutional claims hinges upon the concept of the "unitary business," which is "the linchpin of apportionability in the field of state income taxation." *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). In order for a state to be permitted to tax the income of an out-of-state corporation, the due process clause imposes two requirements: "a 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the interstate values of the enterprise." *Id.* at 436–37, 100 S.Ct. at 1231. If the company is determined to be a unitary business, a state may apply an apportionment formula to the taxpayer's total income to obtain a "rough approximation" of the corporate income that is reasonably related to activities conducted within the state. *Exxon Corp. v. Department of Revenue,* 447 U.S. 207, 223, 100 S.Ct. 2109, 2120, 65 L.Ed.2d 66 (1980). To establish that income is not subject to an apportioned tax, the taxpayer must show that it was earned in the course of activities unrelated to its activities within that state. At 437, 100 S.Ct. at 1231.

■ In determining whether a unitary business exists, courts look to the "underlying economic realities" of the business. *Mobil,* 445 U.S. at 441, 100 S.Ct. at 1233. There must be "some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation— which renders formula apportionment a reasonable method of taxation." *Container Corporation of America v. Franchise Tax Board,* —— U.S. ——, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). The unitary business principle can apply to vertically integrated enterprises or to "a series of similar enterprises operating separately in various jurisdictions but linked by common managerial or operational resources that produced economies of scale and transfers of value." *Id.*

The question of what constitutes a unitary business has produced several recent United States Supreme Court decisions. *Mobil, supra,* involved an attempt by the

State of Vermont to tax "foreign source" dividend income received by Mobil from subsidiaries and affiliates. Mobil Oil is a corporation organized under the laws of New York, with its "commercial domicile" in that state. It is engaged in an integrated petroleum business involving exploration, production, refining, transportation, distribution, and sale. Much of Mobil's business abroad is conducted through subsidiaries and affiliates, some domestically incorporated in states other than Vermont, and some incorporated abroad. The bulk of Mobil's dividend income was received from three subsidiaries incorporated abroad and one affiliate incorporated in Delaware. None of these companies do business in Vermont, where Mobil's activities are confined to wholesale and retail marketing of petroleum and related products.

The Court in *Mobil* confined its inquiry to the question of "whether there is something about the character of income earned from investments in affiliates and subsidiaries operating abroad that precludes, as a constitutional matter, state taxation of that income by the apportionment method." 445 U.S. at 435, 100 S.Ct. at 1230. In rejecting Mobil's contention that it was not involved in a unitary business with its subsidiaries and affiliates, the Court stated:

> "Nor do we find particularly persuasive Mobil's attempt to identify a separate business in its holding company function. So long as dividends from subsidiaries and affiliates reflect profits derived from a functionally integrated enterprise, those dividends are income to the parent earned in a unitary business. One must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability."

445 U.S. at 440, 100 S.Ct. at 1233.

The Court noted that if the business activities of the dividend payors are unrelated to the activities of the recipient in the taxing state, due process considerations might preclude their apportionment, but in the absence of a showing by clear and cogent evidence that the activity is unrelated, the dividend income is properly apportionable.

Similarly, in *Exxon, supra,* the Court held that the State of Wisconsin could constitutionally tax, by application of its statutory apportionment formula, the total corporate income of an integrated oil company even though the company's functional accounting separated its income into three distinct categories of marketing, exploration and production, and refining, and despite the fact that it performed only marketing operations in Wisconsin. The Court stated: "While Exxon may treat its operational departments as independent profit centers, it is nonetheless true that this case involves a highly integrated business which benefits from an umbrella of centralized management and controlled interaction." 447 U.S. at 224, 100 S.Ct. at 2120.

In *ASARCO, Inc. v. Idaho State Tax Commission,* 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982), the Court struck down an attempt by the State of Idaho to tax dividends and interest of subsidiary corporations. ASARCO is a New Jersey corporation that maintains its headquarters and commercial domicile in New York. Its principal Idaho business is the operation of a silver mine. The Court held that Idaho could not constitutionally tax dividends and interest from subsidiaries that were independently operated and engaged in business completely unrelated to the Idaho silver mining business. The Court viewed ASARCO's holdings as merely passive investments and stated that a rule that would allow Idaho to tax these dividends and interest would completely destroy the concept of the unitary business.

In *F.W. Woolworth Co. v. Taxation and Revenue Department,* 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982), decided the same day as *ASARCO,* the Court held that New Mexico could not tax dividends that F.W. Woolworth Co. received from foreign subsidiaries, despite the fact that both parent and subsidiaries were engaged in the business of retailing. The Court based its conclusion that there was no unitary business in the absence of centralized purchas-

ing, manufacturing, or warehousing of merchandise, and the fact that there was no exchange of personnel and no centralization of management.

Most recently, in *Container Corporation, supra,* the Court determined that dividends were apportionable, where most of the foreign subsidiaries were engaged in their respective markets in the same kind of business as the parent. Although the subsidiaries were "relatively autonomous" with respect to day-to-day management, the parent held or guaranteed approximately half of the long-term debt of the subsidiaries, it provided "advice and consultation regarding manufacturing techniques, engineering, design, architecture, insurance, and cost accounting ..." and occasionally assisted the subsidiaries in their procurement of equipment. 103 S.Ct. at 2944. The Court upheld the state's decision to tax the unitary business as "within the realm of permissible judgment." *Id.* at 2946.

### B.

We must now determine whether, under the principles set forth above, Lone Star and International constitute a unitary business. Lone Star argues that because International does not sell products manufactured by Lone Star's Fort Collins plant and no Colorado employees spend time on its operations, the activities of International and Lone Star are not so intertwined as to constitute a single unitary business. We disagree.

■■■■■ The fact that International sold no products manufactured in Colorado is relevant to, but not dispositive of, the unitary business issue. As was noted in *Container Corporation, supra,* "The prerequisite to a constitutionally acceptable finding of unitary business is a flow of *value,* not a flow of goods." 103 S.Ct. at 2947 (emphasis in original). If the relationship between parent and subsidiary contributes to the income of the subsidiary through "functional integration, centralization of management, and economies of scale," a unitary

business exists. *Mobil,* 445 U.S. at 438, 100 S.Ct. at 1232.

■■■■ Unlike the subsidiaries in *ASARCO* and *Woolworth,* International is wholly owned, supplied, managed, and controlled by Lone Star. The iron and coal mined by Lone Star is used to make steel that supplies both the Texas plant and the Colorado plant. The entire business is centrally managed from the Dallas office. The facts here are similar to those which existed in *Exxon* and are dispositive of the unitary business issue. There the Court recognized that, "Exxon's full utilization of its production and refining functions were dependent on its marketing system to provide an outlet for its products and Wisconsin was a part of that marketing system." Similarly, Lone Star's full utilization of its production capacity is dependent upon both the activities of the Fort Collins plant and International. Consequently, we conclude that International is a part of Lone Star's unitary steel business and the dividends are subject to taxation by Colorado.

### C.

■■■■ Lone Star claims that under *ASARCO* the interest paid by Northwest Industries is not apportionable because Northwest is not engaged in a unitary business with Lone Star. *ASARCO,* it will be remembered, held that dividends and interest received from autonomous subsidiaries were not apportionable and that the phrase "unitary business" could not constitutionally be defined to permit nondomiciliary states to apportion and tax dividends "[w]here the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State ...." 458 U.S. at 327, 102 S.Ct. at 3115 (quoting *Mobil,* 445 U.S. at 442, 100 S.Ct. at 1234).

We do not believe that *ASARCO* governs the disposition of this case. The dissent in *ASARCO* stated:

"[A]ssuming *arguendo* that the contested investments were in fact passive, ASARCO has failed to show that its holdings were divorced from its management of the financial requirements of its nonfer-

rous metals business. For all we know, ASARCO's investments were triggered by its need to obtain a return on idle financial resources accumulated for the future operation of its own primary business."

458 U.S. at 337, 102 S.Ct. at 3120 (O'Connor, J., dissenting).

The majority responded to that statement by noting that the trial court had found that: (1) ASARCO's stock investments were "not integral to nor a necessary part of [ASARCO's] business operation"; (2) ASARCO has "never been required to utilize its stock as security for borrowing of working capital, acquiring stock or securities in other companies or to support any bond issues"; and (3) ASARCO had "sufficient cash flow from mining to provide operating capital for all mining operations without reliance upon cash flow from . . . income from intangibles." 458 U.S. at 325 n. 21, 102 S.Ct. at 3113–14 n. 21. Moreover, ASARCO did not contest "Idaho's right to treat interest income from temporary deposits of [its] working capital funds as apportionable business income derived in the ordinary course of [its] Unitary Business activities." *Id.* at 337–338 n. 5, 102 S.Ct. at 1320 n. 5 (O'Connor, J., dissenting). Consequently, we believe Lone Star's reliance on *ASARCO* to be misplaced, because it did not deal with the type of situation presented here.

There are sound reasons for different treatment of ASARCO and Lone Star. ASARCO could legitimately be viewed as engaging in two businesses: nonferrous metal mining and "discrete business enterprises." Because the Court concluded that these two functions were not the same unitary business, it held the dividends and interest to be nontaxable in Idaho. It cannot reasonably be said, however, that Lone Star is engaged in two separate businesses—the integrated steel business and the short-term lending business. Instead, it is engaged in only one business—the integrated steel business—and it lends money to its parent in furtherance of the goals, and to aid the operations, of its unitary business. We see no reason to treat differently interest on Lone Star's short-term loans to Northwest and interest from an interest-bearing checking account or short-term certificates of deposit. The issue is whether the income results from the unitary business operated in the taxing state. Just as it could not be said that Lone Star is engaged in a separate short-term lending business, it cannot be said that a company that maintains its working funds in an interest-bearing account is engaged in a separate business of investing in interest-bearing accounts.

Consequently, we hold that the interest from Lone Star's short-term loans to Northwest results from Lone Star's unitary steel business.

### D.

A finding of the existence of a unitary business does not end our inquiry, for Lone Star may still show that there is no rational relationship between the income attributed to Colorado and the intrastate value of the enterprise, by proving that the income apportioned to Colorado is "out of all proportion to the business transacted in [this] State." *See Hans Rees' Sons, Inc. v. North Carolina,* 283 U.S. 123, 135, 51 S.Ct. 385, 389, 75 L.Ed. 879 (1931). Lone Star claims that Colorado's tax is disproportionate, because among other things, income of $161,226 was taxed by Colorado in 1970, despite the fact that Lone Star showed a loss on its books of $7,653 on its Colorado activities for that year. That showing, however, is not controlling. As the Court stated in *Exxon, supra,* "a company's internal accounting techniques are not binding on a State for tax purposes." 447 U.S. at 221, 100 S.Ct. at 2119. Consequently, the Court held that Wisconsin had not disproportionately taxed Exxon, despite the showing of substantial losses on Exxon's Wisconsin operations.

As was stated in *Mobil, supra,* "separate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management,

and economies of scale." 445 U.S. at 438, 100 S.Ct. at 1232. Because such factors result "from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable 'source.'" We do not believe that Lone Star has met its burden of showing by clear and cogent evidence that extra-territorial value is being taxed, because it has not shown that the functional integration of Lone Star's unitary business, of which the Fort Collins operation is a part, does not contribute to the overall income of Lone Star.

### E.

Lone Star finally argues that the tax on dividends from International and the interest income from Northwest Industries is constitutionally infirm because it results in double taxation. Therefore, it contends, the tax violates the Commerce Clause, U.S. Const., art. I, § 8, because Lone Star is subjected to a burden that would not be imposed on a purely intrastate enterprise.

Lone Star's claim is based upon its payment of the Texas Corporation Franchise Tax, which, it asserts, includes payment on the dividends and interest. That tax is computed by first determining the percentage of business done in Texas, which is calculated by dividing the gross receipts in Texas by the gross receipts everywhere. The resultant percentage is then multiplied by the total of the stated capital, surplus, and undivided profits to determine the net taxable capital and surplus. A similar procedure is used to determine the net taxable long-term debt.

Lone Star concedes that "[t]he comparison of the taxation that occurred in Texas with that which was imposed by Colorado is made more difficult because of the different forms each state uses," but argues that because the dividend and interest income are included in the "Gross Receipts in Texas" figure, it is being doubly taxed—once in Texas and once in Colorado.[3]

Not all duplicative taxation is a violation of the commerce clause. It has been recognized that as long as states use different methods of taxation some duplicative taxation is inevitable. In *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978), the Court was faced with a challenge to Iowa's single-factor formula, based entirely on sales, for apportioning an interstate corporation's income. The taxpayer was an Illinois corporation that sold animal feed in several states, including Iowa. Illinois used the same three-factor formula used by Colorado, which is based upon property and payroll in addition to sales. The taxpayer argued that because of the differences in method, some income was doubly taxed, and therefore Iowa's tax was unconstitutional. The Supreme Court responded to this argument as follows:

> "Even assuming some overlap, we could not accept appellant's argument that Iowa, rather than Illinois, was necessarily at fault in a constitutional sense. It is, of course, true that if Iowa had used Illinois' three-factor formula, a risk of duplication in the figures computed by the two States might have been avoided. But the same would be true had Illinois used the Iowa formula."

*Id.* at 277, 98 S.Ct. at 2346.

Similarly, in this case, Lone Star has not explained why it is Colorado's tax, rather than Texas' tax, that is unconstitutional. Moreover, we note that Lone Star's assistant comptroller testified at trial that under Texas law it could elect to be subject to the Texas franchise tax or to be taxed according to the three-factor Multistate Tax Compact method. Thus, to a large extent, any duplicative taxation is a result of Lone Star's election.

Although the Supreme Court has described the three-factor formula as "a benchmark against which other apportionment formulas are judged," *Container Corp.,* 103 S.Ct. at 2943, it has refused to impose a uniform rule on the states. In *Moorman*

---

**3.** It appears from the record, however, that International's dividends were not considered to be gross receipts in Texas, because it is a Delaware corporation.

*Mfg. Co.,* 437 U.S. at 278, 98 S.Ct. at 2347, the Court stated:

"The only conceivable constitutional basis for invalidating the Iowa statute would be that the Commerce Clause prohibits any overlap in the computation of taxable income by the States. If the Constitution were read to mandate such precision in interstate taxation, the consequences would extend far beyond this particular case. For some risk of duplicative taxation exists whenever the States in which a corporation does business do not follow identical rules for the division of income. Accepting appellant's view of the Constitution, therefore, would require extensive judicial lawmaking. . . .

"Thus, it would be necessary for this Court to prescribe a uniform definition of each category in the three-factor formula. For if the States in which a corporation does business have different rules regarding where a 'sale' takes place, and each includes the same sale in its three-factor computation of the corporation's income, there will be duplicative taxation despite the apparent identity of the formulas employed."

Because we do not believe that Lone Star has satisfied its burden of showing that there has been other than a "fair apportionment," *see id.,* we hold that there has been no violation of the commerce clause.

We affirm the decision of the court of appeals relating to the interest and dividend income, and reverse on the Gaido-Lingle transactions. The cause is remanded to the court of appeals with directions to remand to the Denver District Court for proceedings consistent with the views expressed in this opinion.

DUBOFSKY and KIRSHBAUM, JJ., do not participate.