544 A.2d 764

**NCR CORPORATION**

v.

**COMPTROLLER OF THE TREASURY, INCOME TAX DIVISION.**

**No. 87, Sept.Term, 1987.**

Court of Appeals of Maryland.

Argued Jan. 7, 1988.

Decided July 29, 1988.

Motion for Reconsideration Denied
Aug. 25, 1988.

120

Roger D. Redden, E. Stephen Derby, Kurt J. Fischer and Piper & Marbury, Baltimore, and William L. Goldman (ar-

gued), James A. Riedy and Lee, Toomey & Kent, Washington, D.C., on the brief, for appellant.

Gerald Langbaum, Asst. Atty. Gen., Annapolis (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and John K. Barry, Asst. Atty. Gen., Annapolis, on the brief, for appellee.

Shapiro and Venable, Baetjer & Howard, Baltimore, on the brief, for amicus curiae The Committee on State Taxation of the Council of State Chambers of Commerce.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

ADKINS, Judge.

This case involves corporate tax assessments by the Comptroller of the Treasury (Comptroller) against NCR Corporation (NCR) for the tax years 1972 through 1977. NCR contends that:

1. It should have been allowed to deduct gross-up from its federal taxable income for 1976;

2. it should have been allowed to deduct domestic placement interest income from its federal taxable income; and

3. the Comptroller incorrectly applied the Maryland apportionment formula to NCR's foreign-source income when he excluded from the denominators the foreign subsidiaries' property, payroll, and sales that generated the income.

We reject NCR's first two arguments and remand for further fact-finding as to the third. We thus affirm in part and reverse in part the judgment of the Court of Special Appeals in *Comptroller v. NCR Corp.*, 71 Md.App. 116, 524 A.2d 93 (1987).

This case made its way from the Tax Court to the Circuit Court for Baltimore City to the Court of Special Appeals. To the extent that particular happenings at any of these

levels are important to our decision, we shall discuss them in that portion of this opinion dealing with the particular issue involved. We preface our discussion by noting that during the tax years in question, NCR engaged in the manufacture of business equipment and machinery. It sold its products and related supplies and services at wholesale and retail levels throughout the world.. Its corporate head-quarters and principal place of business were in Ohio, but it had several sales and service offices and a marketing ad-ministrative office in Maryland. The Tax Court determined that NCR's worldwide operations constituted a unitary busi-ness for apportionment purposes. NCR does not contest that finding.

## I. NCR's 1976 Gross–Up Income

Federal tax law permits (or at times relevant to this case permitted) a United States corporation owning at least a 10 percent interest in the voting stock of a foreign subsidiary to elect to claim credit for certain foreign taxes paid by that subsidiary. 26 U.S.C. §§ 901(a), 901(b)(1) and 902(a). For the purposes of these provisions, the credit is allowed for that portion of the foreign taxes which the domestic corpo-ration is deemed to have paid. NCR is such a corporation with respect to ten foreign subsidiaries and it elected to take a "deemed paid" foreign tax credit for the tax year 1976. By virtue of 26 U.S.C. § 78, NCR was required to treat those "deemed paid" credits as "grossed-up" dividend income for federal tax purposes (hence the term "gross-up"). It then claimed a credit against its federal income tax pursuant to § 902(a).[1] On its Maryland return, however, NCR deducted the gross-up from its federal taxable income.

---

1. NCR offers this example of how gross-up operates:
 [I]f a foreign subsidiary of a United States parent earns $100, pays foreign tax of $40, and pays a dividend of $30 out of its after-tax profits of $60, the deemed paid foreign tax credit of the parent under Section 902 (a) is 30/60 x $40, or $20. The parent includes $50 in dividend income (*i.e.,* the actual dividend of $30 plus $20 of "gross-up") and claims a foreign tax credit of $20 against the [f]ederal income tax on this income.
 Brief at 4 n. 1.

The Comptroller disallowed the deduction, on the ground that under Md.Code (1975 Repl.Vol.), Art. 81, § 280A(a), the net taxable income of a corporation, for Maryland tax purposes, is "the taxable income of such taxpayer as defined in the laws of the United States...." Thus, the gross-up was returned to NCR's income.

The Tax Court agreed that § 280A(a) required this treatment. The Circuit Court for Baltimore City did not; it held that taxation of "fictitious" gross-up income was not mandated by § 280A(a) and was unconstitutional by virtue of the due process clause of the fourteenth amendment to the United States Constitution. The Court of Special Appeals held the Tax Court to be correct. It reversed the circuit court, but did not pass on the constitutional issue. NCR insists that a proper interpretation of Maryland law results in the exclusion of gross-up in 1976, and that if we read Maryland law otherwise, it is unconstitutional.

A. *Gross-up and Article 81, § 280A(a)*

As we have seen, § 280A(a) instructs, as it did in 1976, that "[t]he net income of a corporation shall be the taxable income of such taxpayer as defined in the laws of the United States ... for the corresponding taxable period...." The purpose of that provision is "to bring the State taxation system in conformity with the federal scheme." *Comptroller v. American Satellite Corp.*, 312 Md. 537, 545, 540 A.2d 1146, 1150 (1988). Since NCR's 1976 federal taxable income included the gross-up, and since the Maryland statutes applicable to 1976 contained no authority to adjust or deduct that figure, it should, one would think, be included in Maryland taxable income. *See Comptroller v. American Satellite Corp., supra.* But NCR, pointing to somewhat unusual legislative history, reaches a contrary conclusion.

NCR explains that when § 280A was enacted in 1967, subsection (c) provided that "[t]here shall be subtracted from taxable income of ... [the] taxpayer: ... (4) dividend income to the extent included in taxable income...." Thus, all dividend income was effectively excluded from taxation

by Maryland. That changed in 1976. By Ch. 904 of the Acts of that year, subsection (c) was amended to repeal the dividend exclusion. The amended version applied "to all taxable years of corporate taxpayers beginning after December 31, 1975." Ch. 904, Acts of 1976, § 5. This, of course, required inclusion, for Maryland tax purposes, of dividend income included in federal taxable income.

In 1977 the General Assembly revisited § 280A (c) by adding (via Ch. 812 of the Acts of that year) language calling for the subtraction from federal taxable income, to the extent included therein, "(4) any amounts included therein by operation of the provisions of § 78 of the Internal Revenue Code of 1954...." Section 78 is, of course, the gross-up provision, and the 1977 amendment effectively produced the result (at least from its effective date of 1 July 1977) for which NCR now contends.

As NCR reads this history, the 1976 amendment was not directed to gross-up income; it was simply intended to make actual dividend income taxable in Maryland. In 1977 the legislature realized it had made a terrible mistake in the prior year and promptly addressed the gross-up problem by allowing subtraction for Maryland purposes of amounts included in federal income by virtue of § 78. The legislative intent, under this theory, was never to tax gross-up income. Under somewhat similar circumstances, the Supreme Court of Vermont used a subsequent statutory amendment to decipher prior legislative intent in the manner for which NCR now contends. *In re Knosher*, 139 Vt. 285, 287–288, 428 A.2d 1104, 1105 (1981). *See also Winterset, Inc. v. Comm'r of Taxes*, 144 Vt. 230, 232–234, 475 A.2d 231, 232–233 (1984). But we do not see the Maryland legislative history that way.

When we construe a statute, we seek to ascertain and effectuate the legislative goal or object, and our first recourse in doing so is to the words of the statute, giving them their ordinary and natural import. *Comptroller v. American Satellite Corp.*, 312 Md. at 544, 540 A.2d at

1150. The plain words before us now in no way support NCR's conclusion; to the contrary, they bolster the Comptroller's position. Nevertheless, a statute must be construed in context, and the plainest language may be governed by the context in which it appears. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514–516, 525 A.2d 628, 632–633 (1987). Legislative reports and other pertinent legislative history may help to provide the appropriate context. *Id.*

Chapter 812, Acts of 1977, contains only the usual effective date provision—1 July 1977. Unlike the 1976 act, it contains no language carefully spelling out the tax year to which the amendment applies. Statutes are normally prospective in operation absent clear intent to the contrary. *See Mason v. State*, 309 Md. 215, 219–220 & n. 1, 522 A.2d 1344, 1346 & n. 1 (1987); *WSSC v. Riverdale Fire Co.*, 308 Md. 556, 560–561, 520 A.2d 1319, 1321–1322 (1987). The lack of retrospective wording gives NCR's "unintended consequence" argument a somewhat hollow ring. Surely had the General Assembly meant to correct an inadvertent error made in 1976, the 1977 law expressly would have applied to the 1976 tax year. That the legislature knew how to write this sort of language appears from the 1976 act itself. And given a filing date of 15 April 1977, for 1976 tax returns [*see* Md.Code (1975 Repl.Vol.), Art. 81, § 305], it seems particularly clear that a tax statute taking effect on 1 July 1977 was not designed to apply to the 1976 tax year.

Finally, it appears that when the 1976 bill was under consideration in the House Ways and Means Committee, an amendment to allow deduction of gross-up was rejected. *See* Letter of 5 November 1976 from William S. Ratchford, II, to Senator Roy N. Staten. While a committee's rejection of an amendment is clearly not an infallible indication of legislative intent, it may help our understanding of overall legislative history. *See Bd. of Examiners in Optometry v. Spitz*, 300 Md. 466, 479–480, 479 A.2d 363, 369–370 (1984); *Demory Brothers v. Bd. of Pub. Works*, 273 Md. 320, 325–326, 329 A.2d 674, 677 (1974); *Bosely v.*

*Dorsey,* 191 Md. 229, 240, 60 A.2d 691, 696 (1948); *Cohen v. Goldstein,* 58 Md.App. 699, 717, 474 A.2d 229, 237–238, *cert. denied,* 301 Md. 41, 481 A.2d 801 (1984), espousing the proposition that legislative intent cannot be inferred solely from failure of a bill, but failure may be taken into account. *But cf. Automobile Trade Ass'n v. Ins. Comm'r,* 292 Md. 15, 24, 437 A.2d 199, 203 (1981). The "General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute. . . ." *Board of Educ., Garrett Co. v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982). With that in mind, and with all available legislative history before us, we conclude that § 280A, as applied in 1976, required the inclusion of gross-up in NCR's taxable Maryland income for that year. The next question is whether the statute, so construed, is constitutional. It is to that topic that we now turn.

B. *Gross-up and Fourteenth Amendment Due Process*

Though conceding that the income derived from foreign subsidiaries is part of its unitary business, NCR argues that taxation of its gross-up income contravenes the due process clause of the fourteenth amendment to the United States Constitution.[2] This is so, NCR contends, because whether or not it was taxed on gross-up depended solely upon its treatment of foreign taxes paid—*i.e.,* as a credit or deduction on its federal return. Hence, NCR asserts that the "gross-up amount created by its . . . foreign tax credit election bears no 'rational relationship' to its 'interstate values' in Maryland." Brief at 15.

"Under both the Due Process and Commerce Clauses of the Constitution, a State may not, when imposing an income-based tax, 'tax value earned outside its borders.' " *Container Corp. v. Franchise Tax Bd.,* 463 U.S. 159, 164, 103 S.Ct. 2933, 2939, 77 L.Ed.2d 545, 552, *reh'g denied,* 464

---

**2.** Section 1 of that provision in pertinent part provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."

U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983) (quoting *ASARCO, Inc. v. Idaho State Tax Comm'n,* 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982)). Nonetheless, "[i]t has long been established that the income of a business operating in interstate commerce is not immune from fairly apportioned state taxation." *Mobil Oil Corp. v. Comm'r of Taxes,* 445 U.S. 425, 436, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510, 520 (1980); *also see Random House v. Comptroller,* 310 Md. 696, 707, 531 A.2d 683, 688 (1987); *Xerox Corp. v. Comptroller,* 290 Md. 126, 128, 428 A.2d 1208, 1210 (1981).

In order to challenge successfully State apportionment of corporate income, "the taxpayer [must] ... prove 'by clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted ... in that State, ... or has led to a grossly distorted result....'" *Container Corp., supra,* 463 U.S. at 170, 103 S.Ct. at 2942, 77 L.Ed.2d at 556 (quoting *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d 197, 205, *reh'g denied,* 439 U.S. 885, 99 S.Ct. 233, 58 L.Ed.2d 201 (1978)). NCR's argument that its gross-up meets this test relies principally on language extracted from *F.W. Woolworth Co. v. Taxation and Revenue Dept.,* 458 U.S. 354, 372–373, 102 S.Ct. 3128, 3139, 73 L.Ed.2d 819, 833, *reh'g denied,* 459 U.S. 961, 103 S.Ct. 274, 74 L.Ed.2d 213 (1982):

> We need not be detained by New Mexico's reaching out to tax "gross-up" amounts that even the Supreme Court of New Mexico recognized as "fictitious." ... The gross-up computation is a figure that the Federal Government "deems" Woolworth to have received for purposes of part of Woolworth's federal foreign tax credit calculation.... In this case the foreign tax credit arose from the taxation by foreign nations of Woolworth foreign subsidiaries that had no unitary business relationship with New Mexico. New Mexico's effort to tax this income "deemed received"—with respect to which New Mexico contributed

nothing—also must be held to contravene the Due Process Clause.

*Id.* [citations omitted].

 But the reason the Supreme Court of the United States did not need to be detained by New Mexico's efforts to tax Woolworth's gross-up was not because, in that Court's view, State taxation of gross-up was unconstitutional per se. It was because a state cannot tax gross-up dividends, any more than it can tax actual dividends, when the foreign subsidiaries have no unitary business relationship with the state. Since the principle undergirding the holding in *Woolworth* was the absence of a unitary business relationship, the Court was not required to address the due process argument Woolworth directed at New Mexico's inclusion of gross-up. *Woolworth* is of no comfort to NCR; the unitary nature of NCR's business is conceded here.

There are, of course, gross-up cases (or cases involving analogous principles) in which state courts have reached results favorable to the taxpayer by excluding gross-up (or other "income" includible in federal taxable income) from income subject to state taxation. *See Dow Chemical Co. v. Comm'r of Revenue,* 378 Mass. 254, 391 N.E.2d 253 (1979); *Commonwealth v. Emhart Corp.,* 443 Pa. 397, 278 A.2d 916, *appeal dismissed,* 404 U.S. 981, 92 S.Ct. 451, 30 L.Ed.2d 364 (1971); *In re Knosher, supra.* There are also similar cases that hold in favor of the taxing authorities. *See Ex parte Kimberly–Clark Corp.,* 503 So.2d 304 (Ala. 1987); *Caterpillar Tractor Co. v. Lenckos,* 84 Ill.2d 102, 49 Ill.Dec. 329, 417 N.E.2d 1343 (1981), *appeal dismissed sub nom. Chicago, Bridge & Iron Co. v. Caterpillar Tractor Co.,* 463 U.S. 1220, 103 S.Ct. 3562, 77 L.Ed.2d 1402 (1983); *Albany Int'l Corp. v. Halperin,* 388 A.2d 902 (Me.1978); *Commonwealth v. Westinghouse,* 478 Pa. 164, 386 A.2d 491, *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 61, 58 L.Ed.2d 97 (1978). But the outcome in each of these cases turns on the specific provisions of a state statute, or on a reading of legislative intent in light of a particular legislative history or a given state's general approach to statutory interpreta-

tion. None addresses the fourteenth amendment issue that is now before us.

■ One decision that does touch on that issue is *Taxation & Revenue Dept. v. F.W. Woolworth*, 95 N.M. 519, 624 P.2d 28 (1981), *rev'd on other grounds*, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819, *reh'g denied*, 459 U.S. 961, 103 S.Ct. 274, 74 L.Ed.2d 213 (1982). As is obvious from the citation (and as NCR points out), this decision was reversed by the United States Supreme Court. But as we have just observed, that reversal had nothing to do with any conclusion that a state would violate the due process clause of the fourteenth amendment if it taxed gross-up. The Supreme Court did not deal with that issue. The Supreme Court of New Mexico did at least touch on it, and seemed to find no constitutional impediment because Woolworth had received measurable economic benefit from its election to use the federal tax credit as opposed to a federal deduction for foreign taxes paid. *Id.* at 522–523, 624 P.2d at 31–32. And the Supreme Court of North Dakota has very recently reached the same conclusion. *International Minerals & Chem. Corp. v. Heitkamp*, 417 N.W.2d 791 (N.D.1987).

In *Heitkamp*, International Minerals & Chemical Corp. (IMC), a unitary business operating both within and without North Dakota and which owned a number of foreign subsidiaries, took the federal "deemed paid" credit. As in Maryland federal taxable income served as a tax base for state taxable income, but IMC tried to exclude the gross-up amount from its taxable North Dakota income. It made essentially the same constitutional argument that NCR submits to us. Observing, as we have, that the Supreme Court's *Woolworth* did not address the issue, the North Dakota court reasoned:

A domestic corporation required to compute "gross-up" income under [26 U.S.C.] § 78 has received economic benefit from its election to take the § 902 foreign tax credit. By making this voluntary election, IMC has reduced its federal income tax liability. . . .

In this case, it is conceded that IMC's foreign subsidiaries had a unitary business relationship with IMC and North Dakota. Therefore, the due process clause does not preclude North Dakota from taxing actual dividends IMC received from its foreign subsidiaries.... Having elected the benefit of the § 902 "deemed paid" foreign tax credit, IMC in effect chose not to deduct the foreign taxes paid by its foreign subsidiaries but to instead treat them as "dividends" and therefore "gross income" for purposes of the Internal Revenue Code.[3] We do not believe due process requires that IMC be freed from this choice for state tax purposes.... Because North Dakota does not statutorily recognize a deduction for § 78 "gross-up" income, IMC may not exclude the "gross-up" from the amount of federal taxable income reported on its state income tax return.

*Id.* at 796 [citations omitted].

*Heitkamp* is on all fours with the case before us. We agree with the Supreme Court of North Dakota's reasoning, and for the same reasons, hold that the due process clause of the fourteenth amendment does not preclude Maryland from taxing NCR's "gross-up" income for tax year 1976.

## II. NCR's Domestic Placement Income

During the years 1976 and 1977, NCR received income generated from various short-term investments totalling $17,856,121 and $22,138,461, respectively. Of that income, NCR concedes, amounts of $6,440,986 in 1976 and $4,044,-691 in 1977 were from unitary business sources such as finance charges and loans and advances to subsidiaries and

---

3. Generally speaking "a credit is ... more valuable than a deduction because it reduces tax dollar for dollar.... [However,] [b]ecause of the complexity of the separate limitation computations and their effect of reducing prior benefits and because of the reduction in United States tax rates, in some cases taxpayers may wish to deduct their foreign income taxes." 11 J. Mertens, *Law of Federal Income Taxation,* § 45–4.04 (M. Weinstein rev. ed. 1987 & 1988 Cum. Supp.). We presume that NCR acted in its own best interests and that it received financial benefit as a result of its election of the federal tax credit.

agents, and thus were properly subject to Maryland's apportionment tax. But the remainder of that interest income—$11,415,135 in 1976 and $18,093,770 in 1977—was derived from other sources. NCR refers to this other-source income as "domestic placement income" (DPI). The sources of the DPI, it asserts, were nonunitary.

If NCR is correct in this assertion, the DPI was not subject to apportionment in Maryland. The " 'linchpin of apportionability' for state income taxation of an interstate enterprise is the unitary business principle." *F.W. Woolworth Co. v. Taxation and Revenue Dept.*, 458 U.S. at 362, 102 S.Ct. at 3134, 73 L.Ed.2d at 826 (quoting *ASARCO, Inc. v. Idaho State Tax Comm'r*, 458 U.S. at 319, 102 S.Ct. at 3110, 73 L.Ed.2d at 796); *Container Corp., supra,* contains a precise description of the unitary business formula as it has been applied:

> The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the "unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction. This Court long ago upheld the constitutionality of the unitary business/formula apportionment method, although subject to certain constraints.

*Container Corp.*, 463 U.S. at 165, 103 S.Ct. at 2940, 77 L.Ed.2d at 553.

Apportionment under the unitary business formula, however, is not without its restrictions. The due process and commerce clauses do not allow states to tax a corporation's interstate activities unless there exists a " 'minimal connection' or 'nexus' between the interstate activities and

the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.'" *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 219–220, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66, 79 (1980) (quoting *Mobil Oil Corp. v. Comm'r of Taxes, supra*, 445 U.S. at 436–437, 100 S.Ct. at 1231, 63 L.Ed.2d at 520).

In *Xerox Corp. v. Comptroller, supra,* Chief Judge Murphy discussed for the Court the two parts of the due process test:

> The first of the two parts of the due process test—the existence of a "minimal connection" or "nexus"—concerns a State's jurisdiction to tax a business's income. The second part of the test—whether there is a rational relationship between the taxing State and the intrastate values of the taxpayer's enterprise—deals with constitutional limits on the application of a particular apportionment formula.

*Xerox,* 290 Md. at 145, 428 A.2d at 1218–1219.

■ Prong one of the test is satisfied by demonstrating the existence of unitary business, part of which is carried on in the taxing state. Hellerstein, "State Income Taxation of Multijurisdictional Corporations, Part II: Reflections on *ASARCO* and *Woolworth,*" 81 Mich.L.Rev. 157, 168 (1982) (hereinafter "State Income Taxation"). Once the requisite nexus has been shown, the taxpayer then bears the burden of demonstrating that the income it seeks to exclude from taxation was derived from unrelated business activity that constituted a discreet business enterprise. *See Container Corp., supra,* 463 U.S. at 164, 103 S.Ct. at 2939–2940, 77 L.Ed.2d at 552; *Exxon Corp, supra,* 447 U.S. at 223–224, 100 S.Ct. at 2120, 65 L.Ed.2d at 81; *Mobil Oil, supra,* 445 U.S. at 442, 100 S.Ct. at 1234, 63 L.Ed.2d at 524. NCR does not dispute the fact that it maintained several offices in this State. The nexus between it and Maryland was sufficient for imposition of the State income tax. Rather, NCR's contention is that its DPI was derived from sources that were not part of its unitary business and thus the DPI

should not have been apportioned to Maryland. To test this contention, we turn initially to what the Tax Court had to say about the DPI.

The Tax Court observed that NCR "receives ... [DPI] from short term interest bearing instruments, primarily certificates of deposit, backers of acceptances, commercial paper, government notes and municipal bonds." The agency accepted NCR's claim that "the banks, government agencies, and other organizations which issue these short term interest bearing instruments are not part of the unitary business of NCR." It then concluded that since "NCR has shown that the short term investments involved were not part of its unitary operations, i.e., the production and sale of business machines ... apportionment of this interest income ... would violate the due process clause because this income does not represent profits derived from the functionally integrated unitary business of NCR operating in Maryland."

The circuit court agreed with this analysis, but the Court of Special Appeals rejected it, holding that the Tax Court (and the circuit court) had applied an incorrect legal standard. *Comptroller v. NCR Corp.,* 71 Md.App. at 133, 524 A.2d at 101. We agree with the Court of Special Appeals.

NCR assails the Court of Special Appeals for what the taxpayer perceives as that court's failure to give proper deference to the Tax Court's findings, as required by the emphatic teaching of *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 490 A.2d 1296 (1985). The Court of Special Appeals understood and accepted that teaching. Judge Bishop, writing for the intermediate appellate court, pointed out:

As we explained in section II [of the opinion], a tax court receives considerable deference regarding its factual and law to fact determinations. A reviewing court may not disturb findings of fact if they are supported by substantial evidence in the record. *Ramsay, Scarlett,* 302 Md. at 834, 490 A.2d 1296.... Similarly, determinations involving mixed questions of fact and law must be

affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, "a reasoning mind could have reached the Tax Court's conclusion." . . . *[A]ccord Ramsay, Scarlett,* 302 Md. at 838, 490 A.2d 1296.

*Comptroller v. NCR,* 71 Md.App. at 133, 524 A.2d at 101 [other citation omitted]. But as the Court of Special Appeals also recognized, if the Tax Court's legal conclusions are wrong, a reviewing court may "substitute the correct legal principles. *Ramsay, Scarlett,* 302 Md. at 834, 490 A.2d 1296. . . ." *Id. See also Washington Nat'l Arena v. Comptroller,* 308 Md. 370, 378–380, 519 A.2d 1277, 1281–1282 (1987). We now explain why the Tax Court (and the circuit court) erred as a matter of law.

Factually, the Tax Court was unassailably correct in finding that "the banks, government agencies, and other organizations" that produced the DPI "are not part of the unitary business of NCR." But legally, the Tax Court was wrong in concluding that the interest payers had to be a part of NCR's business for apportionment to apply. If that legal standard is correct, then Maryland could not apportion the income derived by NCR from the sale of a cash register to any out-of-state supermarket unaffiliated with NCR, for the supermarket also would not be part of NCR's unitary business. In other words, the focus of the inquiry is on the relationship of the activity in question with the unitary business, not on the identity of the business payer. *Xerox,* 290 Md. at 144, 428 A.2d at 1218.

The Tax Court derived its legal standard from dicta in *Mobil, supra.* In that case the Supreme Court affirmed the apportionability by Vermont of dividend income from Mobil's foreign subsidiaries and affiliates. The Court cautioned, however, that not all dividend income of an interstate unitary business is necessarily taxable. "Where the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State, due process considerations might well preclude apportionability,

because there would be no underlying unitary business." 445 U.S. at 442, 100 S.Ct. at 1234, 63 L.Ed.2d at 523–524.

This view was applied in *ASARCO, supra.* ASARCO's general unitary business was the mining, smelting, and refining of nonferrous metals in various states. Its specific activities in Idaho (the taxing state) had to do with silver mining. The income Idaho sought to apportion consisted chiefly of dividends and interest from certain foreign and domestic subsidiaries. The Supreme Court accepted Idaho's own fact-finding which showed that the degree of control ASARCO exercised over the subsidiaries was insufficient to bring them within ASARCO's unitary business. Under these circumstances, the Court rejected Idaho's argument that "corporate *purpose* should define unitary business ... [and that] intangible income should be considered a part of a unitary business if the intangible property ... is 'acquired, managed or disposed of for purposes relating or contributing to the taxpayer's business.' " 458 U.S. at 326, 102 S.Ct. at 3114, 73 L.Ed.2d at 801 (quoting from Idaho's brief) [emphasis in original].

In so doing the Court reasoned that

[Idaho's] definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently *all* of its operations, including any investment made, in some sense can be said to be "for purposes related to or contributing to the [corporation's] business." When pressed to its logical limit, this conception of the "unitary business" limitation becomes no limitation at all.

*Id.* (quoting from Idaho's brief) [emphasis in original].

What is important about *ASARCO* is its factual foundation. The subsidiaries in question there were discrete business enterprises, that is, they had no connection whatsoever with ASARCO's Idaho activities. The interest payers here involved were also not part of NCR's business machine

enterprise, nor were they controlled by NCR. But to paraphrase *Mobil,* only if "the income was earned in the course of activities unrelated to [NCR's unitary activities in Maryland]" would Maryland be prevented from taxing it. *Mobil,* 445 U.S. at 439, 100 S.Ct. at 1232, 63 L.Ed.2d at 522, quoted in *ASARCO,* 458 U.S. at 317, 102 S.Ct. at 3109, 73 L.Ed.2d at 795. Several cases illustrate approaches other states have taken to the problem.

In *Champion Int'l Corp. v. Bureau of Revenue,* 88 N.M. 411, 540 P.2d 1300 (App.1975), Champion International challenged tax assessments by New Mexico's Commissioner of Revenue on "short-term investments and highly liquid assets from which interest income was derived." *Id.* at 414, 540 P.2d at 1303. This income was used when "needed for future business activity." *Id.*

The court found that "a normal and customary practice by Champion was to invest excess capital, not needed for business purposes, in short-term securities [and that] ... this was a specific function done in the regular course of Champion's business." *Id.* at 414, 540 P.2d at 1303. Consequently, it concluded that the interest income was "business income" within the meaning of N.M.Stat.Ann. § 72–15A–17(A) (Repl.Vol. 10, pt. 2, 1973 Supp.).

As to Champion's constitutional claims, the court said

The Commissioner's decision does not tax out-of-state activity. Neither does the tax statute. The taxation is not beyond the state's taxing authority.

Champion's claim of unconstitutionality based on taxation of out-of-state activity, and its claim that the imposition of the tax is beyond the taxing authority of New Mexico, are both groundless.

88 N.M. at 417, 540 P.2d at 1306.

Of like tenor is *Atlantic Ritchfield Co. v. State,* 198 Colo. 413, 601 P.2d 628 (1979). *Atlantic Ritchfield* concerned Colorado's authority to tax interest income and capital gains

derived from the sale of certain of Atlantic Ritchfield's corporate assets, located outside of Colorado. The Court engaged in a lengthy discussion of whether the interest and capital gains were "business income" within the context of Colo.Rev.Stat. § 24–60–1301, Art. IV(1)(a) (1973). Noting that "[h]istorically, Ritchfield, as part of its business operations, has regularly engaged in major acquisitions and dispositions of the same type involved here, [and that] ... [s]uch acquisitions and dispositions of assets constitute a systematic and recurrent business practice," the court concluded the capital gains and interest constituted "business income." 198 Colo. at 418, 601 P.2d at 632. The court summarily dismissed Atlantic Ritchfield's due process claim concluding that "the apportionment formula is reasonably related to Ritchfield's business activities in Colorado and, therefore, is constitutional." *Id.*

In *Qualls v. Montgomery Ward & Co., Inc.,* 266 Ark. 207, 585 S.W.2d 18 (1979), the Supreme Court of Arkansas upheld state taxation of Montgomery Ward's interest income derived from loans and advances to out-of-state corporate relatives which were not part of its unitary business. In addressing Montgomery Ward's due process challenge, the court reasoned that

Income earned in Arkansas went into Ward's working capital. In the regular course of Ward's business, loans and advances to related corporations earned interest which also went into working capital, a part of which was used to carry on operations in Arkansas. The interest goes into a fund that will be used, in part, in Arkansas, and the supplies and services received from the borrowers contribute to the conduct of Ward's business in Arkansas. These facts provide the necessary nexus, not to justify taxation of the total amount of this interest income, but to justify taxing that portion attributable to Arkansas under the three-factor apportionment formula.

*Id.* at 230, 585 S.W.2d at 30.[4]

These cases, of course, all were decided before *Mobil, Exxon,* and *ASARCO.* But similar results were reached in two post-*ASARCO* cases involving facts like the ones before us. In *Lone Star Steel Co. v. Dolan,* 668 P.2d 916 (Colo.1983), the Supreme Court of Colorado upheld a state tax on Lone Star's interest income derived from short-term loans made to its out-of-state parent.

Lone Star had argued that "under *ASARCO* the interest paid by [its parent was] . . . not apportionable because [the parent was] . . . not engaged in a unitary business with [it]. . . ." *Id.* at 924. The court, citing Justice O'Connor's dissent in *ASARCO* (458 U.S. at 337, 102 S.Ct. at 3120, 73 L.Ed.2d at 808) and the majority's response in note 21 of that case (*id.* at 324 n. 21, 102 S.Ct. at 3113 n. 21, 73 L.Ed.2d at 800 n. 21), concluded that *ASARCO* was not controlling. 668 P.2d at 925. The Colorado court distinguished *ASARCO* thus:

> *ASARCO* could legitimately be viewed as engaging in two businesses: nonferrous metal mining and "discrete business enterprises." Because the Court concluded that these two functions were not the same unitary business, it held the dividends and interest to be nontaxable in Idaho. It cannot reasonably be said, however, that Lone Star is engaged in two separate businesses—the integrated steel business and the short-term lending business. Instead, it is engaged in only one business—the integrated steel business—and *it lends money to its parent in furtherance of the goals, and to aid the operations, of its unitary business.*

* * * * * *

---

**4.** *See also Montgomery Ward & Co. v. Comm'r of Taxation,* 276 Minn. 479, 151 N.W.2d 294 (1967); *Sperry & Hutchinson Co. v. Dept. of Revenue,* 270 Or. 329, 527 P.2d 729 (1974); *Holiday Inns, Inc. v. Olsen,* 692 S.W.2d 850 (Tenn.1985), reaching like conclusions on statutory construction grounds.

> Consequently, we hold that the interest from Lone Star's short-term loans to Northwest results from Lone Star's unitary steel business.

*Id.* at 925 [emphasis supplied].

*Silent Hoist & Crane v. Taxation Div. Director,* 100 N.J. 1, 494 A.2d 775, *cert. denied,* 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 359 (1985), involved a similar situation. There Silent Hoist contested New Jersey's apportionment of income generated from the purchase of real property in New York and from investment of corporate funds in securities. The court found the income to be properly apportionable to New Jersey.

Although, it recognized "that a corporation will not be deemed a unitary corporation merely because the income from a subsidiary or a division adds to the richness of the corporation, [the court found that] . . . the evidence [did] . . . not establish that any of the alleged operations were conducted as a discrete business enterprise." *Id.* at 20–21, 494 A.2d at 785. Among the factors considered critical to the court's determination were that (1) a single employee exercised control over all of Silent Hoist's business operations; (2) the corporation utilized but a single bank account, in which all receipts were deposited and out of which nearly all expenses were paid; (3) and the real property in question was purchased and maintained with corporate funds. *Id.* at 19–21, 494 A.2d at 784–785. Consideration of "the combination of [all] these factors [led the court] . . . indisputably to the conclusion that Silent Hoist [was] a unitary corporation." *Id.* at 21, 494 A.2d at 785–786.

■ In short, the Tax Court was legally wrong when it concluded that it had to exclude the DPI from apportionment merely because the interest payers were independent of NCR. In its most recent discussion of the "unitary" issue, the Supreme Court said that unitariness is demonstrated by "some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a

distinct business operation...." *Container Corp.*, 463 U.S. at 166, 103 S.Ct. at 2940, 77 L.Ed.2d at 554. The evidence before the Tax Court did not show that the investments which produced the DPI were passive. They were actively monitored and carefully timed so as to meet NCR's operating needs. And they did not arise out of a distinct business operation —that is, a money-lending operation, as opposed to the business machine business. As NCR's Mr. Jones testified before the Tax Court: "The funds are turned over and are available for whatever business reason may be necessary at that time, such as debt retirement, [or] acquisition." Record Extract at 47. Mr. Jones also explained that the DPI money was mingled in a general fund, along with income from the sales of equipment. Money from that fund (including DPI) would even be used to fund daily operations

> [w]here we have a negative cash position. If the day's receipts do not equal the day's disbursements, then we would be in a negative position and that negative position would have to be funded. And those funds would come from the general funds.

Record Extract at 103–104.

This uncontradicted testimony strongly suggests, as did the evidence in *Lone Star*, that the interest income was received and used in furtherance of NCR's unitary business. Nor is there anything in the record to suggest that none of the DPI was available for support of NCR's activities in Maryland. We may contrast this record with that in *ASARCO*, where "[t]he trial court ... found [that ASARCO had] ... 'sufficient cash flow from mining to provide operating capital for all mining operations without reliance upon cash flow from ... income from intangibles.' " 458 U.S. at 324 n. 21, 102 S.Ct. at 3113 n. 21, 73 L.Ed.2d at 800 n. 21 (quoting from the trial record).

We shall not, of course, indulge in the Tax Court's fact-finding function. It was NCR that had the burden of proving that its DPI should be excluded from Maryland apportionment. *Container Corp.*, 463 U.S. at 164, 103 S.Ct. at 2939–2940, 77 L.Ed.2d at 552, *Xerox*, 290 Md. at

138–139, 428 A.2d at 1215. As was the case in *Mobil*, NCR has failed to sustain that burden. *Mobil*, 445 U.S. at 442, 100 S.Ct. at 1234, 63 L.Ed.2d at 523–524. Given that failure, and the Tax Court's use of an incorrect legal standard, we hold that the DPI is subject to apportionment here.

III. Adjustment of the Apportionment Formula

Included in NCR's federal taxable income for 1976 and 1977 were both dividends for the tax years 1976 and 1977 and royalty income for the tax years 1972 through 1977. The royalties were paid to NCR by some ten foreign subsidiaries, one 70 percent owned by NCR, the others wholly owned. The royalty payments were made under licensing agreements whereby the subsidiaries compensated NCR for the right to use certain trademarks, patentable and nonpatentable "know-how" and trade secrets. The dividends and royalties formed part of NCR's business income for purposes of Md. Code (1980 Repl. Vol.), Art. 81, § 316 (c), a proposition NCR does not now challenge. Under § 316 (c) the "portion of the business income" of a unitary business "allowable to this State"—that is, the taxpayer's Maryland tax liability—is determined

by using a three-factor (sales, property and payroll) apportionment formula, each "factor" being a fraction. The numerator of the sales factor, for example, is the amount of a corporation's in-state sales; the denominator of the sales factor is the total amount of a corporation's in-state and out-of-state sales. The property and payroll factors are computed in the same manner. The three factors are averaged and the resulting fraction, expressed as a percentage, is multiplied by the corporation's business income. The resulting dollar amount constitutes the business income apportioned to this State. The applicable tax rate is then applied to the corporation's apportioned income.

*Xerox*, 290 Md. at 130, 428 A.2d at 1211. In other words, the Maryland share of the apportionable income is

$$\frac{1}{3}\left(\frac{\text{Md. tangible property}}{\text{All tangible property}} + \frac{\text{Md. payroll}}{\text{All payroll}} + \frac{\text{Md. sales}}{\text{All sales}}\right)$$

*Random House v. Comptroller*, 310 Md. at 701, 531 A.2d at 685.

Although the Comptroller included the dividend and royalty income in NCR's apportionable income, he did not reflect, in the denominators of the formula, the property, payroll, and sales values of the subsidiaries that generated the dividend and royalty income. NCR insists that the formula should have been adjusted to include these values. It argues that to include the income paid to NCR by the subsidiaries, but to exclude the subsidiaries' property, payroll, and sales figures, impermissibly skews the formula by apportioning to Maryland an unduly large share of NCR's business income. The adjustments NCR seeks, it says, are required by the foreign commerce and due process clauses of the United States Constitution, as well as by the correct reading of § 316.[5]

---

**5.** The Tax Court directed the Comptroller to modify the formula in a number of respects. So far as is pertinent to the present posture of this case, the Comptroller was required to include the royalty, interest, and miscellaneous receipts income (generated by NCR's unitary business) in the denominator of the sales factor; the net book value of the copyrights and patents in the denominator of the property factor; and the expenses for foreign employees in research and development in the denominator of the payroll factor.

The Comptroller abandoned his claim of error with respect to the Tax Court order to include the research and development, payroll, and miscellaneous receipts in the denominators of the apportionment factor and did not raise these claims in the Court of Special Appeals nor present them to us in a cross-petition for certiorari. Thus, neither our opinion nor that of the Court of Special Appeals affects the validity of these portions of the Tax Court order. *See* former Md. Rules 813 a, 885, and 1085 and present Rules 8–131 (b)(1) and 8–131 (a).

The remaining portions of the Tax Court order cited above were affirmed by the circuit court. The Comptroller, however, did not raise claims of error as to these directives in the Court of Special Appeals nor did he do so in a cross-petition for certiorari before this Court. Thus, we do not reach these issues and the uncontested

We can dispose of the foreign commerce argument in short order. The issue was not raised in the Tax Court, the Circuit Court for Baltimore City, or the Court of Special Appeals. NCR's petition for certiorari is silent on that subject. The question is not before us. *See* former Md. Rules 885 and 813 a and present Rules 8–131 (a) and 8–131 (b)(1). The other two contentions require more extensive consideration.

### A. *Interpretation of Article 81, § 316 (c)*

If, as NCR asserts, § 316 (c) mandates the formula adjustments it seeks, we need proceed no further. We turn to that problem first.

Section 316 (c) is not too explicit as to what the apportionment formula must contain. The statute speaks only of "a three-factor formula of property, payroll and sales, in which each factor shall be given equal weight and in which the property factor shall include rented as well as owned property and tangible personal property having a permanent situs within this State and used in the trade or business shall be included as well as real property." The Comptroller's regulations in effect for tax years 1976 and 1977 added some flesh to the statutory bones:

> b. [T]here shall be allocated to this State such percentage [of business income] . . . as the average value of the property . . . and business within this State and payroll within this State bears to the average value of the *total* property . . . and *total* business and *total* payroll. . . .
>
> \* \* \* \* \* \*
>
> f. The business within this State shall be measured by the ratio of the gross sales [within Maryland, as defined] . . . to the gross sales made *everywhere* during the taxable year.

Comptroller's Regulation 4A (5), revised 1 January 1968 [emphasis supplied]. The current regulations are very sim-

---

segment of the Tax Court order remains in effect. *See* former Md. Rules 813 a and 885 and present Rules 8–131 (b)(1) and 8–131 (a).

ilar. *See* Md. Regs. Code tit. 3, § 03.04.01.03.C(2), (3), (5), and (6) (1977).

Pointing to this language, NCR avers that both "total" and "everywhere" mean what they say; the words are all inclusive and require the Comptroller to include worldwide values in the denominators of the formula. It finds support for its position in *Kellogg Co. v. Herrington*, 216 Neb. 138, 343 N.W.2d 326 (1984). NCR's reading of *Kellogg* is accurate, but that will avail it naught. The case's reasoning is wholly inconsistent with the Maryland approach to statutory construction.

The Nebraska plan for taxing unitary businesses, as revealed in *Kellogg*, is much like ours. Nebraska, like Maryland, starts with federal taxable income. In the case of a unitary business operating partly within and partly without Nebraska, the federal taxable income (after certain state adjustments are made) is, as in Maryland, apportioned by use of a three-factor formula. The denominators consist of "all" the taxpayer's real and tangible property, "all" of its sales, and payroll "everywhere." Neb.Rev.Stat. §§ 77–2744, 77–2747, and 77–2749 (Reissue 1981). The similarity to the language of the Maryland regulations is apparent.

Kellogg was a multijurisdictional corporation engaged in the unitary business of manufacturing and selling food products. It had 17 foreign subsidiaries from which it received dividends and "know how" fees (like royalties). The Nebraska tax authorities declined to exclude the dividends and fees from federal taxable income. They also refused to include the subsidiaries' property, sales, and payroll values in the denominators of the formula. The trial court, to the contrary, concluded that worldwide income and worldwide property, sales, and payroll figures should be used. The Supreme Court of Nebraska took a slightly different approach, reaching a result virtually identical to the one NCR seeks here.

The *Kellogg* court first pointed out that Nebraska's federal taxable income beginning point precluded inclusion of a

unitary business's worldwide income in the apportionable income figure. The income of the foreign subsidiaries simply was not part of federal taxable income. That portion of the analysis seems unexceptionable. Next, however, the court invoked various canons of statutory construction, particularly the "plain language" rule. Applying them with remorseless rigidity, it read "all" and "everywhere" as statutorily mandating inclusion of the worldwide property values of both Kellogg and its subsidiaries in the formula denominators. 216 Neb. at 145–149, 343 N.W.2d at 331–333.

This exercise in statutory construction produced the lowest possible tax for Kellogg under the formula and, according to one commentator "thrust the revenue position of Nebraska into confusion...." Comment, "Unitary Taxation: An Analysis of State Taxation of Multijurisdictional Corporations in Nebraska," 64 Neb.L.Rev. 135, 136 (1985). We decline to follow *Kellogg*, not because to do so would reduce Maryland revenues, but because to do so would repudiate settled Maryland law dealing with statutory construction.

The Supreme Court of Nebraska, as we have noted, mechanically applied canons of statutory construction. It was heedless of legislative intent and legislative history. Indeed, the result it reached, it confessed, "probably ... does not provide the State with the result it had hoped to obtain by adopting the ... Act." 216 Neb. at 149, 343 N.W.2d at 332. And it admitted that under its interpretation the "State realizes the smallest tax possible"—an outcome that was "not what the legislature intended...." 216 Neb. at 148–149, 343 N.W.2d at 332–333.[6] But in Maryland we do not engage in mindless application of canons of statutory construction. We look at statutory language in

---

6. That the legislature did not intend this outcome is suggested by the fact that promptly after *Kellogg*, it enacted legislation to override the decision. *See* 1984 Neb. Laws, LB 1124 § 22. *Also see* Comment, 64 Neb.L.Rev. 135, 181–188 (1985).

context; we consider legislative history when it is available. *Kaczorowski v. City of Baltimore*, 309 Md. at 514–516, 525 A.2d at 632–633. Our endeavor always is to construe a statute so as to implement the legislative goal, not to frustrate it. *Neal v. Fisher*, 312 Md. 685, 692, 541 A.2d 1314, 1318 (1988).

 We have already held that the goal of § 316 (c) is "taxation of so much of a corporation's net income as is constitutionally permissible." *Xerox*, 290 Md. at 142, 428 A.2d at 1217. *See also Random House*, 310 Md. at 700, 531 A.2d at 684–685. It is also reasonable to conclude that the legislature intended to draft a law that was internally consistent. *See* Comment, 64 Neb.L.Rev. at 179. Article 81, § 280A (a) establishes a corporate taxpayer's federal taxable income as the beginning point for apportionment. We read § 316 (a) and its implementing regulations as applying to that same corporate taxpayer. That is, it is the taxpayer's property, sales, and payroll values, in Maryland and in total or everywhere, that enter the formula. "The taxpayer" does not, of course, include the taxpayer's subsidiaries or their property, sales, and payroll values, just as the subsidiaries' income is not included in the taxpayer's federal taxable income.

This construction of the statute will effectuate apparent legislative goals and is fully consistent with the language of the statute and the regulations. Accordingly, we reject NCR's proposed construction of § 316 (c).

### B. *Due Process*

NCR strenuously contends that our construction of §§ 280A and 316 (c), as applied to its circumstances, deprives it of due process of law. It insists that when royalty income and foreign subsidiary dividend income are included in the apportionable income, but the subsidiaries' property, sales, and payroll values used in producing that income are excluded from the formula denominators, then the result is unconstitutionally skewed in favor of the Comptroller. The

remedy, it asserts, is to require the Comptroller to modify the formula.

There is no doubt that

an apportionment formula must, under both the Due Process and Commerce Clauses, be fair. . . . The first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency —that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed. The second and more difficult requirement is what might be called external consistency—the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. The Constitution does not "invalidat[e] an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing State. . . ."

*Container Corp., supra,* 463 U.S. at 169–170, 103 S.Ct. at 2942, 77 L.Ed.2d at 556 (quoting *Moorman Mfg. Co. v. Bair,* 437 U.S. at 272, 98 S.Ct. at 2344, 57 L.Ed.2d at 204) [citations omitted; emphasis in original]. Nor do we doubt that if a tax as applied is unfair in the constitutional sense (*i.e.,* unconstitutional), the Comptroller may be required to modify the § 316 (c) formula to produce a constitutional result. Ordinarily, formula modification is within the Comptroller's discretion. *See Random House v. Comptroller,* 310 Md. at 705, 531 A.2d at 687; *Chesapeake Industries v. Comptroller,* 59 Md.App. 370, 382, 475 A.2d 1224, 1230 (1984). Section 316 (c) grants him "the right" to do so "in those cases where circumstances warrant. . . ." When application of the formula yields an unconstitutional outcome, the right becomes a duty. The question is whether NCR has demonstrated that in this case there is such an outcome. We address that question while remaining mindful that NCR does not question that all the activities and income involved here are part of a unitary business. The issue that was before the Supreme Court in *ASARCO,*

*supra,* (whether certain income payers were part of a unitary business) is not implicated here.

In *Mobil Oil Corp. v. Comm'r of Taxes, supra,* the Vermont Department of Taxes included Mobil Oil's foreign subsidiary dividend income in that state's apportionable income. But in its three-factor formula application, the department failed to include the property, payroll and sales factors responsible for producing the foreign subsidiary dividend income. For reasons that are not important here, the majority declined to decide "whether application of Vermont's formula produced a fair attribution of [Mobil Oil's] ... dividend income to that State." *Mobil Oil,* 445 U.S. at 434, 100 S.Ct. at 1230, 63 L.Ed.2d at 519.

Justice Stevens, however, did reach the issue. In a strongly worded dissent he remarked that

> But of greatest importance, the record contains no information about the payrolls, sales or property values of any of those corporations, and Vermont has made no attempt to incorporate them into the apportionment formula computations. Unless the sales, payroll, and property values connected with the production of income by the payor corporations are added to the denominator of the apportionment formula, the inclusion of earnings attributable to those corporations in the apportionable tax base will inevitably cause Mobil's Vermont income to be overstated.

*Id.* at 460–461, 100 S.Ct. at 1243, 63 L.Ed.2d at 535 (Stevens, J., dissenting) [footnote omitted].

Justice Stevens thus concluded that "Vermont's apportionment formula [had] ... been applied in an arbitrary and unconstitutional way." *Id.* at 451, 100 S.Ct. at 1238, 63 L.Ed.2d at 530. Vermont had in his opinion "indefensibly used its apportionment methodology artificially to multiply its share of Mobil's 1970 taxable income perhaps as much as tenfold." *Id.* at 461, 100 S.Ct. at 1243, 63 L.Ed.2d at 535. *Also see Random House,* 310 Md. at 708, 531 A.2d at 689 (quoting Justice Steven's dissent). This prompted him to propose what he viewed as a permissible application of the

three-factor formula—one which "fairly summarizes consolidated earnings, and takes the payroll, sales and property of the payor corporations into account." *Id.* at 462, 100 S.Ct. at 1244, 63 L.Ed.2d at 536.

It is NCR's notion that the Supreme Court has now adopted Justice Stevens's lone dissent. It claims that this metamorphosis was achieved via footnote 5 in *Container Corp., supra.* NCR is indulging in wishful thinking. In the course of rejecting Container Corporation's claim of unconstitutional application of an apportionment formula, the Court did refer to Justice Stevens's *Mobil* dissent. But to say that the Court adopted that dissent is wrong. Footnote 5 does no more than to summarize, in neutral fashion, both the majority and minority positions in *Mobil.*[7] *Container Corp.*, 463 U.S. at 168 n. 5, 103 S.Ct. at 2942 n. 5, 77 L.Ed.2d at 555 n. 5. In point of fact, the *Container Corp.* Court, instead of adopting the sort of per se rule advocated by Justice Stevens, said that a court "will [only] strike down the application of an apportionment formula if the taxpayer can prove 'by clear and cogent evidence that the income attributed to the state is in fact out of all proportion to the business transacted ... in that State or has led to a grossly distorted result'...." *Container Corp.*, 463 U.S. at 170, 103 S.Ct. at 2942, 77 L.Ed. at 556 (quoting *Moorman Mfg. Co.*, 437 U.S. at 274, 98 S.Ct. at 2345, 57 L.Ed.2d at 205) [citations omitted]. Even a recent state appellate decision on the subject has not gone as far as the Stevens/NCR position.

*American Telephone & Telegraph Co. v. Wisconsin Dept. of Revenue*, 143 Wis.2d. 533, 422 N.W.2d 629 (1988), was a case in which the taxing authority included in A.T. & T.'s apportionable income dividends and interest paid to it by its subsidiaries. The authority did not include anything

---

7. *Mobil* was a 6–1 decision. Justice Blackmun wrote for the majority (himself, Chief Justice Burger and Justices Brennan, White, Powell and Rehnquist). Justice Stevens dissented. Justices Stewart and Marshall did not participate.

relative to the subsidiaries in the denominators of the apportionment factor. This, according to the Wisconsin Court of Appeals, was unconstitutional because

the apportionment formula used by the department does not bear a reasonable relation to the corporate activities of the Bell System in Wisconsin; it apportions to Wisconsin far too much income of the Bell System in relation to its property located here, its sales or its payroll.... [T]he taxes which Wisconsin exacts from A.T. & T. are grossly disproportionate to the benefits conferred.

*Id.* at 549, 422 N.W.2d at 636. *But see NCR Corp. v. Comm'r of Revenue,* No. 4224 Minn. Tax Court, filed 8 March 1988 [available on WESTLAW, 1988 WL 31675], *cert. granted* (Minn. No. ——, 11 April 1988) (rejecting claims of NCR similar to those asserted here, and by A.T. & T. in Wisconsin).

 NCR advances the concept that fairness is the test of due process constitutionality in the context of unitary business income taxation. We agree. *Random House,* 310 Md. at 707, 531 A.2d at 688. But as we said also there:

Random House seems to treat the principle of fairness as if it existed independently of the absence of gross disproportionality. In theory, there is only one principle—fairness. But to demonstrate in practice that the principle has been violated in a particular case the taxpayer must prove disproportionality to a constitutionally significant degree.

*Id.* That, of course, is what A.T. & T. apparently was able to prove in its case in Wisconsin. The intermediate appellate court found gross disproportionality, although the published opinion does not reveal the facts and figures on which that conclusion was based, nor are we made privy to just how "gross" the "disproportion" was. That is what Mobil failed to prove in its case in Vermont, and later in the Supreme Court. In the Supreme Court, Mobil based its case on a different strategy, and simply did not address the extent of the alleged disproportionality. *Mobil Oil,* 445 U.S. at 434–435, 100 S.Ct. at 1230, 63 L.Ed.2d at 519. And

in our Court, Xerox was unable to convince us that use of the apportionment formula led to a "'grossly distorted result'" or that the "assessments were '... out of [all] appropriate proportion' to the business ... transacted in this State." *Xerox*, 290 Md. at 147, 428 A.2d at 1220 (quoting *Moorman Mfg. Co.*, 437 U.S. at 274, 98 S.Ct. at 2345, 57 L.Ed.2d at 205). *See also Random House*, 310 Md. at 709, 531 A.2d at 689 ("the Comptroller was not specifically compelled to value Random House's subsidiary rights when the method used by him produced an apportionment which has not been shown to fall outside of constitutional tolerances").

NCR is correct in asserting that the formula, as applied to it, does not produce ideally fair results. *See* Hellerstein, "State Income Taxation of Multijurisdictional Corporations: Reflections on *Mobil, Exxon*, and H.R. 5076," 79 Mich.L. Rev. 113, 127–130 (1980); Peters, "Sup. Ct.'s *Mobil* Decision on Multistate Income Apportionment Raises New Questions," 53 J. Tax'n 36, 39 (1980); Rudolph, "State Taxation of Interstate Business: The Unitary Business Concept and Affiliated Corporate Groups," 25 Tax.L.Rev. 171, 205 (1970); Comment, "State Taxation of Multinationals and the Unitary Business Concept: A Contemporary View," 10 Brooklyn J. Int'l Law 115, 154–155 (1984) (hereinafter "State Taxation of Multinationals"); Comment, "Taxation, Inclusion of Foreign Source Dividend Income in State Apportionment Formula—*Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425 [100 S.Ct. 1223, 63 L.Ed.2d 510] (1980)," 22 Harv. Int'l L.J. 491, 497 (1981). As we have pointed out, however, that is not the test. The question becomes whether NCR has demonstrated that the existing distortion is so grossly disproportionate that it is unconstitutional.

By various exercises in mathematics, NCR purports to show that the formula as applied by the Comptroller has an aggregate denominator 75 percent less than would be the case were the values attributable to its foreign subsidiaries included. The Comptroller responds with a mathematical exercise which purports to show that the difference is in the

neighborhood of 11 percent. In order to determine whether the distortion in taxable income apportionable to Maryland is within the range we found constitutional in *Random House*, 310 Md. at 706–707, 531 A.2d at 688 (10 percent), and the Supreme Court found constitutionally acceptable in *Container Corp.*, 463 U.S. at 184, 103 S.Ct. at 2950, 77 L.Ed.2d at 565 (14 percent) but constitutionally unacceptable in *Hans Rees' Sons Inc. v. North Carolina ex rel. Maxwell*, 283 U.S. 123, 135, 51 S.Ct. 385, 389, 74 L.Ed. 879, 908 (1931) (250 percent), we must examine the computations of each party.

The proper focus of the inquiry for the purposes of determining apportionment distortion is on "the percentage increase in taxable income apportioned to [the taxing state]...." *Random House*, 310 Md. at 706, 531 A.2d at 688. *Also see Container Corp.*, 463 U.S. at 184, 103 S.Ct. at 2950, 77 L.Ed.2d at 565. Of course taxpayers can, as NCR does here, and as Random House did in that case, present proposals as to how they think the apportionment formula should be structured in a given case.[8]

NCR wants its subsidiaries' property, sales, and payroll factors included in the formula denominators because dividends and royalties received from the foreign subsidiaries are included in its apportionable income. There is at least one difficulty with this. The royalties do not require the special treatment that NCR requests. If NCR licensed a nonsubsidiary corporation to use certain of its business machinery, patents, and trademarks, the income

---

**8.** There are many ways to approach the taxation of a multistate business—consolidated returns, combined reports, use of worldwide income and worldwide property, sales and payroll values, without regard to corporate entities. In all likelihood, none is perfect. *See* Burash and Weinstein, "Combined Reporting: The Approach and Its Problems," 1 J. of State Tax'n 5 (1982); Kaden, "State Taxation of Multinational Corporations," 32 Cath.U.L.Rev. 829, 840–849 (1983); "State Taxation of Multinationals," *supra*, 10 Brooklyn J. Int'l Law at 116–124.

received in exchange would be unitary business income, but surely there would be no requirement to include the licensee's property, sales, and payroll values in the denominators of the formula. We are dealing here with the sale of a right to use a patent or trademark, which is similar to the sale of a business machine. The fact that in this case licenses were granted to NCR's subsidiaries does not change the nature of the underlying transaction, just as a sale of a business machine to a subsidiary would be treated like the sale of the same machine to a nonaffiliated customer. Thus, the foreign subsidiary property, payroll, and sales factors which generated NCR's royalty income should not have been included in the denominators of the apportionment formula.

Nonetheless, it may not be unreasonable to suggest that inclusion of subsidiaries' dividends in the apportionable income should be balanced by some changes in the formula denominator. But the balancing should not be done by including the total property, sales, and payroll values of the subsidiaries in the formula denominators. Instead, the denominators should be modified by including only those percentages of the foreign subsidiaries' property, payroll, and sales that generated the foreign subsidiary dividend income taxed by Maryland.

As we have seen, certain modifications of the apportionment formula ordered by the Tax Court remain unchallenged and await implementation. *See* note 5, *supra.* Because these modifications and those which might be required due to our holdings in Parts I and II of this opinion have not yet been entered into the apportionment formula calculus, we are unable to determine, in any meaningful way, the extent to which a reasonably structured formula (as we have described it) might differ in its results from a formula which excludes that portion of the foreign subsidiary property, payroll, and sales which generated the dividend income. As a further consequence, we cannot tell

whether disproportionality of constitutional proportions is present here.

We cannot agree with the Court of Special Appeals that NCR has failed to meet its burden of proof on this issue. NCR presented its case to the Tax Court in considerable detail. The presentation included exhibits demonstrating various outcomes based on various adjustments of the formula. Since that time, however, the case has proceeded through numerous stages in the review process. This complex litigation has been further complicated by the several orders for modification of the Comptroller's taxing scheme and by concessions on the part of both sides. As a matter of fairness, NCR should now have an opportunity to develop facts as to the extent of any disproportionality, in light of the principles now established in this case.

Consequently, we shall direct a remand to the Tax Court. On remand the agency should first implement the uncontested segment of its own order [*see* note 5, *supra* ] and make any other adjustments to the apportionment formula that are necessitated by our holding in Parts I and II of this opinion. It should then calculate the amount of distortion that occurs when the formula excludes the portions of the foreign subsidiaries' property, payroll, and sales that generated the foreign subsidiary dividend income. After calculating the distortion, the agency should determine whether that distortion is of constitutional dimensions. If so, the formula must be modified to reflect the foreign subsidiary factors. If not, modification is unnecessary.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF ORDER REMANDING TO THE TAX COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID TWO–THIRDS BY NCR AND ONE–THIRD BY THE COMPTROLLER.