23328

NCR CORPORATION, Appellant v. SOUTH CAROLINA
TAX COMMISSION, Respondent.

(402 S.E. (2d) 666)

Supreme Court

*John C. von Lehe, Jr.* and *Stephen P. Groves,* Charleston, and *William L. Goldman,* of *Lee, Toomey & Kent,* Washington, D.C., *for appellant.*

*Deputy Atty. Gen. Ray N. Stevens, S.C. Tax Com'n,* Columbia, *for respondent.*

Heard Oct. 23, 1990.

Decided Feb. 4, 1991.

TOAL, Justice:

This appeal involves an attempt by NCR Corporation ("NCR") to recover certain corporate income taxes and li-

cense fees paid under protest to the South Carolina Tax Commission ("Tax Commission"). The trial judge ruled that no refund should be given NCR. We affirm in part and remand.

## FACTS

NCR is a multinational corporation engaged in the business of developing, manufacturing, marketing, installing, and servicing business information processing systems. All phases of NCR's businesses are conducted partly within and partly without South Carolina. In foreign countries, NCR conducts its business both directly through branch offices and through subsidiary corporations. During the years at issue (the 1981-1983 tax years) there existed approximately eighteen foreign branches and seventy-five foreign subsidiaries doing business in approximately one hundred fifty-nine countries. The foreign subsidiaries are owned 100% by NCR, with the exception of NCR's subsidiary in Japan, in which NCR has 70% ownership. These subsidiary companies have not conducted any business within South Carolina.

In conducting this worldwide business, NCR develops, acquires, owns, and uses patents and patent rights, both in the United States and in foreign countries. Also, NCR registers patents and licensing agreements in foreign countries pursuant to which NCR's foreign subsidiaries have the right to manufacture and sell business machines and equipment in those countries. These patent licensing agreements generate royalty income to NCR from the foreign subsidiaries. Further, NCR registers certain foreign loan agreements in foreign countries. It therefore receives interest income from the various loans it makes to the foreign subsidiaries. NCR also receives interest income from deposits it makes in foreign countries.

This royalty and interest income is itemized in NCR's federal income tax return as royalty and interest income earned in these foreign countries. Foreign countries in which NCR and its subsidiaries do business tax the net income of the subsidiaries. In addition, many of the countries impose an unapportioned tax on NCR on the full value of all royalty and interest amounts earned by NCR and paid to it by its foreign subsidiaries. A federal tax credit is granted to NCR for the royalty and interest income taxes paid to foreign governments.

The royalty income of NCR here in dispute is as follows:

| 1981 | 1982 | 1983 |
| --- | --- | --- |
| $32,996,316 | $39,242,371 | $49,992,119 |

The interest income of NCR here in dispute is:

| 1981 | 1982 | 1983 |
| --- | --- | --- |
| $18,304,080 | $23,924,409 | $16,562,396 |

South Carolina's corporate income tax is an apportioned income tax, through which South Carolina attempts to tax NCR's unitary business[1] income on roughly a percentage basis which is derived by comparing NCR's South Carolina business to the rest of its business. NCR's corporate income tax liability in South Carolina is determined by using a three-factor apportionment formula.[2] The factors are sales, property, and payroll. Each "factor" is reduced to a fraction. The numerator of the sales factor, for example, is the amount of NCR's South Carolina sales; the denominator of the sales factor is the amount of NCR's South Carolina sales combined with all other sales. The property and payroll factors are computed in the same manner. The three factors are averaged and the resulting fraction, expressed in a percentage, is multiplied by NCR's total business income. The resulting dollar amount is the business income properly apportioned to this state for taxation. The tax is then levied on this apportioned income. *See generally, Emerson Elec. Co. v. Wasson,* 287 S.C. 394, 339 S.E. (2d) 118 (1986).

Here, the Tax Commission included in NCR's total income for tax purposes the royalty and interest income it received from its foreign subsidiaries. The Tax Commission did not include in its apportionment equation any of the foreign subsidiaries' sales, property or payroll. NCR argues that South Carolina may not tax it in this manner, since such a tax: (1) is contrary to statutory mandates; (2) violates the foreign commerce clause of the United States Constitution; and (3) violates the due process clause of the United States Constitution.

---

[1] All parties concede that NCR is engaged in an integrated unitary business nationwide and worldwide.

[2] *See* S.C. Code Ann. §§ 12-7-1120 to 12-7-1170 (1976 and Supp. 1989).

NCR therefore seeks $499,007 by way of a refund of taxes paid under protest.

## LAW/ANALYSIS

### I. STATUTORY CONSTRUCTION

NCR contends we should interpret our statutory apportionment taxing scheme as requiring that foreign subsidiaries' payroll, property, and sales be included in the denominator of South Carolina's apportionment formula. NCR cites, by way of example, § 12-7-1150 (1989 Supp.), which contains the procedure to be used for determining the "property" factor. This statutory section provides, in pertinent part, for a:

> "ratio of the average value of the real estate and tangible personal property, as defined in this section, used by such taxpayer in this State during the income year, to the average value of the entire real estate and tangible personal property, as defined in this section, used by the taxpayer *everywhere* during the income year...." (emphasis added).

Similar verbiage is used in the statutory sections dealing with the sales and payroll factors. NCR points to the language such as "everywhere" in § 12-7-1150 and argues that its plain meaning mandates an inclusion of the foreign subsidiaries' sales, property, and payroll in the denominator of the fraction used to determine apportioned income.

It appears only one court has agreed with NCR's position in this regard. *See Kellogg Co. v. Herrington,* 216 Neb. 138, 343 N.W. (2d) 326 (1984). The *Kellogg* Court purported to apply statutory construction rules, including the "plain meaning" rule, in reaching the result NCR urges here. *Kellogg* has been criticized heavily as "mindless," and as "heedless" of clear legislative intent. *NCR Corp. v. Commissioner of Revenue,* 438 N.W. (2d) 86 (Minn. 1989); *NCR Corp. v. Comptroller of the Treasury,* 313 Md. 118, 544 A. (2d) 764 (1988).

Although the statutes indeed do include words aiding NCR's urged interpretation, those words must be read in context. Each of the statutory sections defining the ratios of property, payroll, and sales use the singular word "taxpayer." In *Emerson Elec. Co. v. Wasson,* 287 S.C. 394, 339 S.E. (2d)

118 (1986), we held parent and subsidiary corporations are not to be considered a single entity for purposes of § 12-7-1170. South Carolina is not taxing the income of NCR's subsidiaries, but instead only the income of NCR itself as a separate corporate entity. Consequently, subsidiary payroll, sales, and property also should generally not be considered under our statutory scheme.

We follow the holding of the Maryland Court in *NCR Corp. v. Comptroller of the Treasury*, 313 Md. 118, 544 A. (2d) 764, 777-78 (1988), in which the court stated:

> it is the taxpayer's property, sales, and payroll values, in Maryland and in total or everywhere, that enter the formula. "The taxpayer" does not, of course, include the taxpayer's subsidiaries or their property, sales and payroll values, just as the subsidiaries' income is not included. . . .

We also rely upon the Minnesota Supreme Court's ruling in *NCR Corp. v. Commissioner of Revenue*, 438 N.W. (2d) 86 (Minn. 1989), in which the Court held:

> Because NCR is the only "taxpayer" involved in this case, the apportionment statute contemplates that only its factors of property used, payroll paid, and sales made are relevant for inclusion in the denominator of the apportionment function. Therefore, NCR's construction argument must be rejected.

We likewise reject NCR's argument in this regard.

## II. FOREIGN COMMERCE CLAUSE

NCR next argues that, since foreign countries have taxed the royalty and interest amounts in full, South Carolina may not do so since such would amount to a violation of the foreign commerce clause. The foreign commerce clause provides: "Congress shall have power . . . to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. CONST. Art. I, § 8, cl. 3. NCR maintains the United States Supreme Court decision in *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 99 S. Ct. 1813, 60 L. Ed. (2d) 336 (1979) requires reversal of the trial court.

*Japan Line* dealt with an attempt by California to impose

an *ad valorem* property tax on cargo containers, owned by Japanese companies, which were instrumentalities of foreign commerce and which were temporarily located in various California ports while *en route* to other destinations. The same containers were also subject to an unapportioned property tax in Japan. The *Japan Line* Court first set forth the test used in determining whether an impermissible burden on interstate commerce had resulted from the state tax, and established that test as a threshold challenge to be met by the state in foreign commerce clause tax cases. The Court stated: "[i]f the State tax 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State, no impermissible burden on interstate commerce will be found." *Japan Line*, 441 U.S. at 444-45, 99 S. Ct. at 1819 (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 1079, 51 L. Ed. (2d) 326 (1977)).

The *Japan Line* Court next established that:

> An inquiry more elaborate than that mandated by *Complete Auto* is necessary when a state seeks to tax the instrumentalities of foreign, rather than of interstate, commerce. In addition to answering the nexus, apportionment, and nondiscrimination questions posed in *Complete Auto*, a court must also inquire, first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and second, whether the tax prevents the Federal Government from "speaking with one voice when regulating commercial relations with foreign governments." If a State tax contravenes either of these precepts, it is unconstitutional under the Commerce Clause.

441 U.S. at 451, 99 S. Ct. at 1823. The Court proceeded to employ those two additional tests, and found that the California tax contravened both "precepts." Specifically, the Court found that California's tax in fact caused a "double tax"; and that a treaty entitled the "Customs Convention on Containers" existed between the United States and Japan, which stated that containers used exclusively in foreign commerce and "temporarily imported are admitted free of 'all duties and taxes

whatsoever chargeable by reason of importation.' " 441 U.S. at 453, 99 S. Ct. at 1824 (quoting from 20 U.S.T. at 304). Hence, the Court reasoned, the actual double tax present violated prong one of the foreign commerce clause test, and the state tax in the face of the treaty contravened prong two—that the Federal Government must be able to speak with one voice.

Read in isolation, *Japan Line* appears to support NCR's position here. However, the case controlling the situation here is not *Japan Line* in our view, but *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 103 S. Ct. 2933, 77 L. Ed. 545 (1983). In *Container Corp.* the Court retreated from its broad *Japan Line* rules and in our view restricted *Japan Line* substantially. *Container Corp.* again involved a California tax. This time, however, the tax was an apportioned corporate income tax on Container Corporation, a company headquartered in Illinois but doing business in California as well as other states and countries. California imposed the same three-factor apportionment formula upon Container corporation as was here imposed by the Tax Commission on NCR.

The *Container Corp.* Court first addressed this formula method of taxation thusly:

> Under both the Due Process and the Commerce Clauses of the Constitution, a State may not, when imposing an income-based tax, "tax value earned outside its borders." In the case of a more-or-less integrated business enterprise operating in more than one State, however, arriving at precise territorial allocations of "value" is often an elusive goal, both in theory and in practice. For this reason and others, we have long held that the Constitution imposes no single formula on the states, and that the taxpayer has the "distinct burden of showing by 'clear and cogent evidence' that [the state tax] results in extraterritorial values being taxed. . . ."
>
> . . . .
>
> The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the

"unitary business" of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that "unitary business" between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction. This Court long ago upheld the constitutionality [of this] method. . . .

463 U.S. at 164-65, 103 S. Ct. at 2939-40. (citations omitted). The Court went on to state that the three-factor formula used by California (and South Carolina here) not only met its approval but was "something of a benchmark against which other apportionment formulas are judged." 463 U.S. at 170, 103 S. Ct. at 2943. .

In *Container Corp.*, California required Container Corporation, against its will, to include all foreign subsidiary income as part of its "unitary" business, and at the same time included in its calculations the foreign subsidiaries' property, payroll, and taxes. Container Corporation complained that the inclusion of the foreign subsidiary income in California's apportionment tax scheme violated the *Japan Line* case, since the foreign countries had already taxed the same income on an unapportioned basis.[3]

On this point the Court retreated from its *Japan Line* test. The Court first stated:

[t]his case is similar to *Japan Line* in a number of important respects. First, the tax imposed here, like the tax imposed in Japan Line, has resulted in actual double taxation, in the sense that some of the income taxed without apportionment by foreign nations as attributable to appellant's foreign subsidiaries was also taxed by California as attributable to the State's share of the total income of

---

[3] The taxing scheme employed by the Tax Commission here differs from California's. California ignored corporate identities and included all foreign subsidiary income and all foreign subsidiary property, payroll, and taxes in its apportionment formula. South Carolina uses the "separate entity" method, in which corporate divisions are recognized. Either method is permissible as a general matter. See Container Corp., supra, 463 U.S. at 167-168, 103 S. Ct. at 2933. Container Corp. rejected the foreign commerce clause complaint of multiple taxation where the California method of ignoring corporate identities was involved; we reject the same argument here, where the separate entity method is used.

the unitary business of which those subsidiaries are a part.

*Container Corp.*, 463 U.S. at 187, 103 S. Ct. at 2951-52. However, where actual double taxation appeared to end the inquiry in *Japan Line*, the *Container Corp.* Court stated "[n]evertheless, there are also a number of ways in which this case is clearly distinguishable from *Japan Line.*" 463 U.S. at 187-88, 103 S. Ct. at 2952. The Court observed that the *Container Corp.* decision was distinguishable since: (1) the tax is on income rather than property; (2) the double taxation, although real, is not "inevitable" under the California taxing scheme; and (3) the tax falls on a domestic corporation, not a foreign owner of an instrumentality of foreign commerce.

The same distinguishing factors exist which make *Japan Line* inapplicable in the instant case. This is not a property tax case. We are unconvinced that double taxation is "inevitable" under the South Carolina taxing scheme. *See NCR Corp. v. Commissioner of Revenue*, 438 N.W. (2d) 86 (Minn. 1989) (holding the Minnesota separate entity taxing scheme employed there in an identical situation as here did not result in inevitable double taxation).[4] Further, the tax here falls on a domestic corporation, not a foreign company as in *Japan Line.*

As to the second prong of *Japan Line*—that a state taxing scheme should not prevent the Federal Government from speaking with one voice—the test is "whether a state tax implicates foreign policy issues or violates a clear federal directive." *NCR Corp. v. Commissioner of Revenue, supra*, 438 N.W. (2d) at 94-95 (citing Container Corp., 463 U.S. at 194, 103 S. Ct. at 2955). We reject NCR's contention that this prong of *Japan Line* is violated, as we perceive no clear Federal directive precluding the South Carolina Tax Commis-

---

[4] Even if we were convinced the tax resulted in inevitable double taxation, we doubt, in light of the other facts clearly distinguishing this case from Japan Line, that the taxing scheme should be struck down. Indeed, the Container Corp. Court observed, "we specifically left open in Japan Line the application of that case to 'domestically owned instrumentalities engaged in foreign commerce' . . . and—to the extent that corporations can be analogized to cargo containers in the first place—this case clearly falls within that reservation." 463 U.S. at 188-89, 103 S. Ct. at 2952.

sion's actions. "Whether any alleged increased tax liability affects federal foreign policy is, as observed by the Supreme Court of the United States, more appropriately addressed by other branches of the government." *NCR Corp. v. Commissioner of Revenue, supra,* 438 N.W. (2d) at 95.[5]

Thus, we reject NCR's foreign commerce clause argument, and hold that the method of taxation employed by the Tax Commission passes all constitutional tests in that regard. We next address NCR's due process contention.

## III. DUE PROCESS

It cannot be doubted that "fairness is the test of due process constitutionality in the context of unitary business income taxation." *NCR Corp. v. Comptroller of the Treasury,* 313 Md. 118, 544 A. (2d) 764, 779 (1988).

> [A]n apportionment formula must, under both the Due Process and Commerce Clauses, be fair. . . . The first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency—that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed. The second and more difficult requirement is what might be called external consistency—the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated. The Constitution does not "invalidat[e] an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing state. . . ."

*Container Corp.,* 463 U.S. at 169-170, 103 S. Ct. at 2942 (quoting *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 272, 98 S. Ct. 2340, 2344, 57 L. Ed. (2d) 197, 204 (1978)) (citations omitted; emphasis in original).

At bottom, in order to prove a violation of due process, a taxpayer must clearly and cogently prove the apportionment formula, as applied, "has led to a grossly distorted result" or that "the income attributed to the state is in fact out of all pro-

---

[5] We note that no treaty similar to that in *Japan Line* exists here which by its text prevents state taxation of NCR's foreign subsidiary royalty and interest income.

portion to the business transacted . . . in that State." *NCR Corp. v. Comptroller of the Treasury, supra,* 313 Md. 118, 544 A. (2d) at 779 (quoting *Container Corp.,* 463 U.S. at 170, 103 S. Ct. at 2942). NCR asserts that unfairness results from South Carolina's taxing scheme because no foreign subsidiary property, payroll, or sales are considered in the denominator of South Carolina's apportionment formula for determining NCR's percentage of business conducted in South Carolina, while at the same time income generated at least in part by those foreign subsidiaries is included in NCR's income subject to taxation. We have located three other state court decisions addressing this question.

In *American Tel. and Teleg. Co. v. Wisconsin Dept. of Rev.,* 143 Wis. (2d) 533, 422 N. W. (2d) 629 (1988), the Wisconsin Court of Appeals dealt with this issue. First the court noted that:

> Commentators, however, have recognized that future constitutional attacks on state taxation of unitary businesses may focus, as does A.T.&T.'s attack, on apportionment formulas which allegedly give insufficient weight to the sales, property, and payroll of subsidiaries which make dividend, interest, royalty, and other payments to the parent corporation which are included by the taxing state as income subject to apportionment.

422 N.W. (2d) at 635. The court then stated, "[t]he simple but controlling question is whether the state (of Wisconsin) has given anything for which it can ask return." *Id.* at 636. Answering this rhetorical question, the court held,

> Wisconsin has given to A.T.&T. the privilege of carrying on business in the state. It has provided its Long Lines Department protection, governmental services and the benefits of orderly, civilized society. But the taxes which Wisconsin exacts from A.T.&T. are grossly disproportionate to the benefits conferred.
>
> . . . .
>
> [W]e conclude the apportionment formula used by the department does not reflect a reasonable sense of how A.T.&T.'s income is generated and taxes value earned outside the borders of Wisconsin. . . .

*Id.* at 636.

The opposite of this decision can be found in *NCR Corp. v. Commissioner of Revenue*, 438 N.W. (2d) 86 (Minn. 1989). That case had virtually identical facts as the instant case. Finding that the increase in NCR's taxes from the application of the apportionment formula was 23% when compared to what NCR's taxes would be if a proportionate measure of the foreign subsidiaries' sales, property, and payroll were factored in, the Minnesota Supreme Court held that this distortion was not "outside the substantial margin of error" allowed, and was not grossly disproportional to the activity carried on in Minnesota by NCR. 438 N.W. (2d) at 93. The Minnesota Supreme Court pointed out the United States Supreme Court has ruled that a gross disparity existed when there was a 250% increase in tax, *see Hans Rees Sons, Inc. v. North Carolina*, 283 U.S. 123, 51 S. Ct. 385, 75 L. Ed. 879 (1931), but that one does not exist when there was an increase of 14%. *See Container Corp., supra.* The Minnesota Court then concluded 23% was more like the *Container Corp.* decision than *Hans Rees Sons.*[6]

Finally, the Court of Appeals of Maryland also addressed this issue in *NCR Corp. v. Comptroller of the Treasury*, 313 Md. 118, 544 A. (2d) 764 (1988). That case also involved very similar facts as the instant case. The Maryland Court first noted that "NCR is correct in asserting that the formula, as applied to it, does not produce ideally fair results. . . . The question becomes whether NCR has demonstrated that the existing distortion is so grossly disproportionate that it is unconstitutional." *Id.*, 544 A. (2d) at 780.

We agree with the reasoning of the Court of Appeals of Maryland. South Carolina's taxing scheme is not ideally fair. To a degree, the income received by NCR from its foreign subsidiaries was earned in the United States (and to an extent in South Carolina) as it was partly here where loan monies were created and patents developed and researched. Hence, domestic payroll, property, and sales which are related to producing this royalty and interest income (like domestic research and development companies) have already been in-

---

[6] Obviously, taxing schemes producing such disparities, expressed in percentages, must be resolved on a case-by-case basis.

cluded in the formula denominator. However, if the wholly owned foreign subsidiary did not exist, no royalty or interest income could be generated for NCR, obviously.

In this vein, the Maryland Court held, dealing with dividends rather than royalty and interest income:

> [i]t may not be unreasonable to suggest that inclusion of subsidiaries' dividends in the apportionable income [of NCR] should be balanced by some changes in the formula denominator. But the balancing should not be done by including the total property, sales, and payroll values. . . . Instead, the denominators should be modified by including only those percentages of the foreign subsidiaries' property, payroll, and sales that generated the foreign subsidiary dividend income taxed by Maryland.

*Id.*, 544 A. (2d) at 781. We adopt the Court of Appeals of Maryland's reasoning that:

> we are unable to determine [from the record],[7] in any meaningful way, the extent to which a reasonably structured formula . . . might differ in its results from a formula which excludes that portion of the foreign subsidiary property, payroll, and sales which generated the dividend income. As a further consequence, we cannot tell whether disproportionality [a grossly distorted result] of constitutional proportions is present here.

*Id.*

Because the trial court did not adequately consider this disproportionality issue, we remand this case to the lower court for a re-factoring of the formula, considering in the formula denominator the proportionate measure (as determined by the trial court led by the broad guidelines set out in this opinion) of the foreign subsidiaries' property, payroll, and sales which generated the NCR income. Once this is done, the new tax amount should be figured and compared with the tax amount presently assessed against NCR by the Tax Commission. If the trial court finds there is a gross disparity between

---

[7] This case is unlike *American Tel. & Teleg. Co., supra, NCR Corp. v. Commissioner, supra; Container Corp., supra;* and *Hans Rees' Sons, supra,* in which the courts were able to determine from the record whether a "grossly distorted result" was produced from the taxing scheme.

the two amounts of constitutional proportions, it shall order the new tax amount to be assessed and refund granted. If no gross distortion exists upon a comparison of the tax amounts, the original tax assessed against NCR shall stand and NCR shall not be entitled to any refund.

Accordingly, the judgment of the lower court is affirmed in part and remanded.

GREGORY, C.J., and HARWELL, CHANDLER and FINNEY, JJ., concur.